COYLE CHEVROLET COMPANY,
Appellant (Defendant Below),

v.

Lelia J. CARRIER, Appellee
(Plaintiff Below).

No. 1–179A28.

Court of Appeals of Indiana,
Fourth District.

Dec. 20, 1979.

Rehearing Denied Feb. 12, 1980.

Michael J. McDaniel, New Albany, for appellant.

Donald R. Forrest, New Albany, for appellee.

MILLER, Presiding Judge.

Defendant-Appellant Coyle Chevrolet (Coyle) appeals from a jury verdict awarding Plaintiff-Appellee Lelia J. Carrier (Carrier) $9,500 in damages. Carrier had filed a three paragraph complaint alleging a car purchased from Coyle was defective and claiming breach of warranty, revocation of acceptance and punitive damages. We affirm.

Coyle raises the following three issues for our review:

1. Were the damages awarded excessive in that Carrier presented no evidence of damages to substantiate the verdict of $9,500.00?

2. Was there sufficient evidence to prove that the alleged nonconformities in the automobile substantially impaired its value to Carrier?

3. Was the verdict contrary to law because Carrier did not give Coyle a reasonable opportunity to cure the alleged defects as required by *Ind. Code* 26–1–2–508?

Carrier purchased a 1978 Monte Carlo from Coyle for $7,367.90 on November 1, 1977. When the salesman delivered the car, he also brought the financial papers which indicated the deferred payment price was $9,190.00 including sales tax and finance charge. Carrier knew the automobile had been driven about fifty miles. The salesman assured her it was a new car and not a demonstrator. However, the price sticker normally attached to the window of a new car was not present. Michael D. Coyle, president of Coyle, testified that the words "Kel's demo" were written on the sticker and the car may have been ordered as a demonstrator. Further, he testified that any car with less than 250 miles was still considered a new car.

When the car was delivered, antifreeze was leaking from the radiator. The salesman assured Carrier that Coyle would service it. When she drove the vehicle over the next four or five days, the engine died and the dome light under the glove compartment remained lighted until she un-

screwed the bulb. Carrier then took the car to Coyle for service. However, the electrical problems were not corrected. Shortly after her purchase it was necessary for Carrier, after two flat tires, to make several trips to the tire dealer who finally replaced the tire.

Two weeks after the car was purchased, the rear window began to leak. Carrier returned the car for repairs and reported approximately ten to twelve other problems. Coyle agreed to repair the window and gave her a car to drive during the week which it took for repairs. During this visit Carrier indicated she wanted to trade her car since it had so many problems. The salesman responded "no new car is perfect, lady." Her request to consult with Mr. Coyle was, according to her testimony, thwarted by the salesman. He told her she would lose money on a trade and they would do everything they could to fix the car if she kept it.

Several weeks later, still in November of 1977, the entire rear window shattered. Coyle ordered a new window and declined to furnish Carrier with a substitute car, thereby forcing her to drive for a week with a piece of plastic on the window. A week later, Carrier was furnished a substitute but her own car remained in her garage three more weeks awaiting the new window. She then delivered the car, pursuant to Coyle's instructions, to Wolfe Glass Company and was informed she would be called when the window was replaced. Three or four weeks later Coyle called and told her the car had been sitting on its lot for three weeks.[1] When she arrived at the agency she was told the car could not be released because there was no work order. She was also informed that General Motors would not pay for the window if she could not present a piece of glass from the original window. However, the next morning, a Thursday, Carrier was permitted to pick up her car without charge. On the following Saturday, when the car was driven through a car wash, the rear window leaked again and water and chemicals were spilled on her young daughter. Being concerned that her daughter might be injured, she called the poison department of the hospital. Apparently, the child was unharmed. Shortly thereafter, Carrier contacted an attorney.

During the three and one-half months before she contacted her attorney, Carrier had taken the car to Coyle for repairs six times. Many of the defects complained of related to the electrical system. The dome lights went on and off, the glove compartment light remained on and had to be removed, the lights went on when the windshield wiper was started and the radio did not operate properly. The electrical wiring had dropped to the floor on the passenger side so that a passenger's foot could accidentally entangle in the wiring. In addition, the top of the dashboard was sinking and was cracked and ripped around both the air conditioning and the radio, which had been installed by Coyle. The radio speakers were warped. Some of the wires were loose. In November 1977, Coyle agreed to replace the dash but indicated it would take six to eight weeks to acquire. Carrier inquired about it three or four times and each time was informed that the dash "was coming in" and was on order.[2] It was never replaced. The radio was never fixed because Coyle indicated it wanted to wait until the dash was installed and all of the electrical things could be repaired at one time. During this period, paint on the car bubbled and the car was repainted. One of the doors had to be slammed shut and this defect was never cured.

After Carrier filed suit in April of 1978, she discovered her trunk was leaking and her air conditioner did not work. Carrier was without use of her car for seven or eight weeks but during all except one week of that period Coyle provided her with a substitute car. All repairs, including those not satisfactorily performed, were made by Coyle without cost to Carrier.

---

1. During this period, Coyle was closed for four days due to a blizzard and the car was buried under the snow.

2. None of Coyle's witnesses could confirm that the dashboard was ever ordered.

*EXCESSIVE DAMAGES—BREACH OF WARRANTY*

Coyle first argues that the jury verdict of $9,500.00 was excessive and not supported by the evidence. It acknowledges the measure of damages for breach of warranty as provided by the Uniform Commercial Code, *Ind. Code* 26–1–2–714(2), to be "the value of the goods as warranted less the value as accepted." *Auto-Teria, Inc. v. Ahern* (1976), Ind.App. 352 N.E.2d 774, 783. It further concedes that the price paid for the car is competent evidence of its value as warranted citing *Bob Anderson Pontiac, Inc. v. Davidson* (1973), 155 Ind.App. 395, 293 N.E.2d 232. It then claims the $7,367.90 purchase price of the car, less Carrier's opinion evidence of $500.00 as the car's value when accepted, would be the total amount recoverable. Thus, $6,867.90 would be the maximum damage, an amount considerably less than the $9,500.00 awarded. Coyle further alleges the jury award could not include incidental or punitive damages. Finally Coyle contends that no instructions were given to the jury as to punitive damages nor did the jury in its verdict, which was general, designate any part of the award as punitive damages.

Before answering these contentions, we point out that we must give effect to the verdict of the jury if it is sustainable on any theory. *Devine v. Grace Construction and Supply Co.* (1962), 243 Ind. 98, 181 N.E.2d 862; *Pfisterer v. Key* (1941), 218 Ind. 521, 33 N.E.2d 330; *Ertel v. Radio Corp. of America* (1976), Ind.App., 354 N.E.2d 783. Thus, by finding the jury verdict to be supported by the evidence on Carrier's theory of breach of warranty, which we do, we avoid the necessity of considering other claimed errors relating to her theory of revocation of acceptance.

Our Uniform Commercial Code, I.C. 26–1–2–714 and 715 provides the measure of damages for breach of warranty as follows:

Sec. 714:

\* \* \* \* \* \*

"(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

"(3) In a proper case any incidental and consequential damages under the next section may also be recovered."

Sec. 715:

"(1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

"(2) Consequential damages resulting from the seller's breach include

(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

(b) injury to person or property proximately resulting from any breach of warranty."

Here, the jury was instructed on the theory of implied warranty of merchantability, *Ind. Code* 26–1–2–314, and the measure of damages therefor. They were entitled to return a verdict representing the difference between the value of the car as warranted less its value when accepted plus incidental and consequential damages. Carrier purchased the car and executed a retail installment contract therefor. This contract, which was delivered to Carrier by Coyle's salesman, showed the cash price of the car to be $7,367.90 plus $240.72 sales tax and a finance charge of $1,581.38 for a total of $9,190.00.

Coyle fails to comprehend the significance of the evidence relating to the sales tax and finance charge. The sales tax is clearly an incidental damage resulting from

expenses "reasonably incurred in . . . receipt" of the car. *Ind. Code.* 26–1–2–715. *Lloyd v. Classic Motor Coaches, Inc.,* 388 F.Supp. 785 (N.D.Ohio 1974).[3] We recently held in *Hudson v. Dave McIntire, Inc.* (1979), Ind.App., 390 N.E.2d 179, 184, that finance charges could be included as a consequential damage.

Consequential damages are recoverable when they represent a loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know. Such damages should be direct, immediate and probable and not speculative. The determination of these damages is a question for resolution by the trier of fact. *Jerry Alderman Ford Sales, Inc. v. Bailey* (1972), 154 Ind.App. 632, 647, 648, 291 N.E.2d 92 mod. reh. den. 294 N.E.2d 617. This is a question of first impression in this state. However, we see no reason why this type of damage could not be assessed as a consequential damage where the buyer presents evidence that the seller had "reason to know" the buyer needed to borrow money in order to complete the purchase. See *Carl Beasley Ford, Inc. v. Burroughs Corporation,* 361 F.Supp. 325 (E.D.Pa.1973), where such damages were awarded. *Id.* at 184, footnote 4.

Further, we note some jurisdictions consider the sales tax and finance charge as part of the price of the goods as warranted. *Burrus v. Itek Corp.* (1977), 46 Ill.App.3d 350, 4 Ill.Dec. 793, 360 N.E.2d 1168; *Thomas Chrysler Plymouth, Inc. v. Meyers* (1970), 48 Ala.App. 350, 264 So.2d 893. Thus under either theory Carrier proved actual damages of $8,690.00 ($9,190.00 less $500, Carrier's value of the car when accepted).

 But Coyle attacks the valuation testimony of Carrier (which was the only evidence of the value of the car when accepted) claiming her opinion was based on the car's value at trial and after she had driven it 16,000 miles rather than the value at the time of acceptance. We first note that the owner of personal property is competent to testify as to its value. *Bonds v. State* (1966) 247 Ind. 260, 214 N.E.2d 796, (quoting Underhill's Criminal Evidence, 5th Ed., § 322). *See State v. Hamar* (1937), 211 Ind. 570, 199 N.E. 589; *Fox v. Cox* (1898), 20 Ind.App. 61, 50 N.E. 92; I.L.E. *Evidence* § 259 (1959). With regard to Carrier's valuation testimony we refer to the record. After relating the defects of the car, Carrier was quizzed as follows:

"Q144 Mrs. Carrier, let me ask you this question. As the owner of the 1978 Monte Carlo, which is the subject matter of this lawsuit, is [sic] the owner of that car and based upon the problems and defects to which you have testified, do you have an opinion as to the value or the worth of that automobile?

A From all the trouble that I have experienced and everything else, I would say probably Five Hundred Dollars."

On cross-examination the following occurred:

Q275 You used the figure of Five Hundred Dollars, and what was that in relation to?

A What my car is worth.

Q276 That's what you think the car is worth now?

A That's right.

Q277 Is that based on an appraised value, or is that just what it is worth to you?

A It never has been appraised or valued, no, it's what it's worth to me. If I were to go out and try to sell it I probably would be doing good if I could get that much out of it, considering the water damage, my air conditioning doesn't work, my dash is sinking, my lighting doesn't work, you know. It's a used car.

Q278 What I'm getting at that's the figure that you have come up with yourself?

A You asked me how much I thought, and I said Five Hundred Dollars.

Q279 But I asked you if this was a figure that someone else, if you had it appraised or you had it valued?

---

3. *Lloyd, supra,* holds that sales tax, license fees and insurance are incidental damages.

A I have never had it appraised, no. Admittedly, on such a significant element, Carrier's attorney could have more carefully prepared his case and framed his question or questions in a more precise manner. However, after reviewing the direct and cross-examination, we conclude the jury could have inferred that Carrier's testimony related to the value at time of acceptance, even though some of the defects were discovered later, and, further, that at the time of trial she believed the car to be worth somewhat less.

Finally, Coyle attacks the apparent inclusion of punitive damages in the jury's verdict claiming (1) no instructions were given on this issue, (2) there was no evidence of same and (3) the jury's general verdict failed to include punitive damages as a separate item. First, the record discloses that there were, in fact, two instructions given authorizing the jury to award punitive damages, one tendered by Carrier and given without objection and the other tendered by Coyle. No mention of these instructions is found in Coyle's Motion To Correct Errors. Since Coyle itself presented this issue to the jury we cannot consider, as error, the award of some punitive damages. We can consider, if properly raised, the issue of whether such damages are excessive. *Richardson v. Scroggham* (1974), 159 Ind.App. 400, 307 N.E.2d 80. In its brief Coyle makes no argument that the punitive damages were *excessive* and has waived this issue, Ind. Rules of Procedure, App. Rule 8.3(A)(7). In any event, after considering all of the evidence concerning the defects of the car in question, we cannot say that additional punitive damages of $810.00 is so outrageous and excessive that the judgment in this cause would require reversal. *Hibschman Pontiac, Inc. v. Batchelor* (1977), Ind. 362 N.E.2d 845.

Coyle's claim that the verdict form was improper and did not specifically include punitive damages is without merit.

It did not tender a form of verdict nor object to the verdict when it was entered. Therefore, the verdict cannot be attacked on appeal. *Salem-Bedford Stone Co. v. O'Brien* (1898), 150 Ind. 656, 49 N.E. 457; *Murphy Auto Sales, Inc. v. Coomer* (1953), 123 Ind.App. 709, 112 N.E.2d 589 (in Banc.)

*Errors Relating To Revocation of Acceptance Theory.*

Coyle's remaining alleged errors are also without merit. First it claims the alleged deficiencies of the automobile did not substantially impair its value to Carrier, citing *Ind. Code* 26–1–2–608 (1) which, in part, provides:

"The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity could substantially impair its value to him . . . ."

This provision of our Code, by its own language, is applicable to an action for revocation of acceptance. In its brief Coyle does not discuss why or how such provision is applicable in a breach of warranty action. The evidence here was sufficient to support the jury award on a breach of warranty theory [4] and, consequently the failure to prove an element of revocation of acceptance is irrelevant.

Coyle's last claimed error is that Carrier did not afford it an opportunity to cure the defects in the car pursuant to the provisions of *Ind. Code* 26–1–2–508 which provides:

Sec. 508:

\* \* \* \* \* \*

(1) Where any tender or delivery by the seller is rejected because nonconforming and the time for performance has not yet expired, the seller may seasonably notify the buyer of his intention to cure and may then within the contract time make a conforming delivery.

(2) Where the buyer rejects a nonconforming tender which the seller had rea-

---

4. Coyle did not assert in its brief that its acts did not constitute a breach of warranty. Its arguments under the first issue discussed in this opinion related to the amount of damages awarded. We believe the evidence of defects was sufficient to show a breach. *Hibschman Pontiac, Inc. v. Batchelor, supra.*

sonable grounds to believe would be acceptable with or without money allowance the seller may if he may if he seasonably notifies the buyer have a further reasonable time to substitute a conforming tender.

Again, the provisions of this section are not applicable to a breach of warranty theory. The right to cure arises only upon the buyer's rejection of the goods. *Bronebake v. Cox*, 499 F.2d 951 (8th Cir. 1974); *Linscott v. Smith* (1978), Kan.App. 587 P.2d 1271.

 We acknowledge that in certain revocation of acceptance actions, the question of whether a nonconformity has been seasonably cured is an issue. In *Ind. Code* 26–1–2–608, it is provided:

Sec. 608:

"(1) The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it

(a) on the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; . . ."

When a revocation action is based on provisions of the foregoing statute, the plaintiff undoubtedly has the burden of showing that the nonconformity was not seasonably cured. But a plaintiff has no such burden in a breach of warranty action and, therefore, the absence of such proof in this case would not serve to defeat Carrier's award of damages for breach of warranty.

The judgment is affirmed.

CHIPMAN and YOUNG, JJ., concur.