Daniel JORDAN and Allie Baker, Appellants,

v.

Thomas TALAGA and Rebecca Talaga, Appellees.

No. 45A04–8612–CV–382.

Court of Appeals of Indiana, Fourth District.

Jan. 9, 1989.

Rehearing Denied March 13, 1989.

Nick J. Anast, Visvaldis P. Kupsis, Schererville, John W. Tousley, Terrance Pehler, Indianapolis, for appellants.

Kenneth L. Anderson, Highland, for appellees.

MILLER, Judge.

Thomas and Rebecca Talaga brought suit against Jordan and Baker, the developers of Sandridge, a subdivision in Schererville, Indiana, to recover for the dimunition in value of their home and for personal property damage caused by a severe water and drainage problem on their property. The Talagas sued under the alternative theories of negligence and breach of an implied warranty of habitability alleging the developers, Jordan and Baker, knowingly sold property improved for the purpose of home building located in a substantial natural water course.

The jury returned a general verdict in favor of the Talagas in the amount of $74,000; the trial judge entered judgment for the reduced amount of $65,000 to reflect amounts received by the Talagas in settlement from other defendants. We affirm the verdict under the theory of an implied warranty of habitability.

## ISSUES

Jordan and Baker raise nine (9) issues on appeal. We applaud the excellent briefs submitted by Jordan and Baker and the amicus curiae brief submitted by the Home Builders Association of Indiana, Inc. We address seven issues. One issue pertaining to negligence precludes recovery under that theory; therefore, we need not address the other two issues pertaining solely to negligence. The remaining issues, reordered and restated, are as follows:

(1) Whether the Talagas may recover economic damages under a negligence theory?

(2) Whether an implied warranty of habitability attaches to the sale of land improved by developers for the purpose of home building?

(3) Whether the Talagas gave Jordan and Baker timely notice of the defect?

(4) Whether the $74,000.00 verdict is supported by evidence?

(5) Whether an instruction advising the jury of a ten year statute of limitations applicable to actions for damages to real property invaded the province of the jury in deciding the issue of a reasonable time

for the Talagas to give notice under the theory of an implied warranty of habitability?

(6) Whether the settlement agreement releasing the Town of Schererville from the lawsuit also released Jordan and Baker?

(7) Whether showing the jury the Talagas' home movie depicting a graphic flooding scene of the property was error?

## FACTS

In 1972, Daniel Jordan and Allie Baker began to develop Sandridge, a subdivision in Schererville, Indiana. On the northwest border of Sandridge lies a marshy area of property owned by Robert J. Britton. A natural channel of water flows from Britton's land in a southeasterly direction through the Sandridge subdivision and eventually drains into Turkey Creek, the major drainage retaining area for the subdivision. When the land became subdivided, the channel of water ran along the border of the lot eventually purchased by the Talagas.

Jordan and Baker made improvements to the raw land to facilitate development. These improvements included constructing streets, sanitary sewers, drainage sewers, and the rough grading of lots. An engineer, Earl Goldberg, was employed to help with many of the facets of development including the provision of a plan for the drainage of water. Goldberg, Jordan and Baker knew about the existing channel of water and determined that enlarging an existing swale [1] on the edge of the Talagas lot would adequately handle the water draining from Britton's property and direct it into the streets' storm sewers. A ten foot easement, the only easement in the entire subdivision, was provided for in the plat to accomodate this swale which was to be cut along the edge of the property. Evidence conflicted as to whether this natural swale, cut by water erosion, was ever improved to meet Goldberg's specifications.

Dewey Snow, an excavating contractor, testified that he cut the swale in 1976, and Baker testified he laid sod over it. But, the Talagas and three of their neighbors all testified that a swale was never cut.

In June 1975, Bruce Piper of Piper Enterprises, Inc. purchased the lot in question from Jordan and Baker for $8,599.00. Piper built a tri-level home and sold it to the Talagas for $42,500 on or about October 31, 1975. Piper selected and purchased the lot from the plat map posted in Jordan's office and knew about the easement which existed for drainage purposes but did not know that the water course periodically swelled into a stream that flowed onto and across the lot. He experienced no water problems during the construction of the Talagas' home.

In February, 1976, the Talagas experienced for the first time water flooding into their backyard. They contacted both Piper and Jordan to tell them about the situation. Piper came and assisted Thomas Talaga in digging a ditch along the northwest side of the lot to drain the water around the house. Piper described the condition as "bad," saying the water was standing two or three inches deep and came close to the house.

Unbeknownst to the Talagas, Jordan, too, went to inspect the flooding on their lot. He testified at trial that he later telephoned the Talagas to say that they should complete the final grading of their lot to allow the standing water to drain away. Although Jordan and Baker had done the rough grading of the lot, the Talagas had agreed with Piper to take care of the final grading.

Rebecca Talaga again telephoned Jordan the next month to tell him that she and her husband wanted to build a garage to adjoin their existing driveway on the north side of their house and therefore needed to know about the plans for taking care of the drainage. Jordan told her once the weather became dry, he planned to cut a swale along a ten-foot easement on the northern boundary of the Talagas' property. The

---

1. A swale is "an elongated depression in land that is at least seasonally wet or marshy, is usually heavily vegetated, and is normally with-out flowing water." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, 1976 Ed.

Talagas proceeded to have their garage built in April at a cost of $3,450. Then, in late summer, Jordan and Baker installed an eight-inch drainage pipe under the ground beneath the easement. That pipe connected to a storm sewer in the street. Baker testified that the purpose of the pipe was to drain any casual water that might accumulate in the swale, but it was not intended to drain the water that flowed onto the lot from the Britton property. Baker testified that he then had a swale constructed over the pipe.

In 1979, Britton began to remove sand and dirt from his property which apparently exacerbated the Talagas flooding problem.[2] The Talagas continued to have flooding on their property two or three times a year. They tried to alleviate the situation by installing an eight-inch plastic pipe over the existing pipe Jordan and Baker had installed under the easement. The Schererville Fire Department sometimes pumped the water out of the backyard and into the street. Neighbors worked with the Fire Department to try to impede the water course. Neighbors brought their own pumps to help take the water away. Several neighbors testified that they used wheel barrows to reload and reinstall the sand and earth that washed from the Talagas' yard and underneath their driveway into the street below. One neighbor testified he had helped with this procedure 20 to 25 times. The Talagas testified they had been especially careful to keep the drainage pipe free of debris so that its capacity for carrying the water away would not be impeded. They also dug a trench to route the water around their house. Yet, these attempts to deter the water failed, and in 1983 and again in 1985, water not only flooded their land, but came into their

house as well. It was after the 1983 incident of flooding inside the house that the Talagas consulted an attorney and initiated this lawsuit.

Robert Lippman, a civil engineer and licensed land surveyor, prepared a model, drawn to scale, of the Talagas' house and the surrounding land. He testified he had examined U.S. Geological Survey maps and aerial photographs of the Sandridge area which were made in 1970, 1975, and 1980. In his opinion there was a natural water course that flowed from the pond on the Britton property onto the Talaga lot before 1975, probably having been there since the time of the glaciers. He said this flow should have been calculated in the development of Sandridge, and that an eight-inch pipe extending into the street was not sufficient to take the flow, especially when the street itself was full of water.

Lippman testified further that the Talagas' house had been damaged by both the volume and the velocity of water coming from 20 acres, down a narrow ditch, and spreading down both sides of their driveway. He said in his opinion a reasonable, prudent developer would not put a stream of that nature onto a lot; and, too, that it would not be the normal course of action for a developer to allow a house to be built on such a lot. Lippman stated that to have made the lot useable, the water should have been diverted underground or away from it. Otherwise, the land was useless. He also said that if the Talagas were to redirect the downspouts on their house, the flow of rainfall on their lot would be lessened, but it would be a "drop in the bucket" compared to the amount of water that would continue to course across their land.[3]

---

**2.** Britton was originally a defendant in this action but was able to obtain a summary judgment in his favor pursuant to the common enemy rule set out in *Argyelan v. Haviland* (1982), Ind., 435 N.E.2d 973. Also, the Town of Schererville, Bruce Piper, and Bruce Piper Enterprises, Inc. were originally defendants in this action but entered into covenants-not-to-sue with the Talagas and were dismissed from the action.

**3.** Ample evidence corroborated Lippman's conclusions. Several neighbors testified for the Ta-

lagas. Julie Nolbertowicz, who lived three houses away, stated that after a rain the water would stand in the street for about two days before finally draining away. She said the sand and rock from the Talagas' yard washed into the street and would have to be cleared away after every heavy rain. Dan Shofroth, who lived to the north of the Talagas, testified that when the water flooded the Talagas' home, it came inside by overflowing the window wells and seeping through the windows.

Lippman testified there were several ways the water could have been handled initially. He said the Town required that sewers be made to accomodate a five-year rain, which was the most economical plan for developers. However, he noted this plan often got the developers into trouble. He suggested the water could have been handled by retaining it on the Britton property. Or, the size of the storm sewer in the street and the drainage pipe to the back of the lot could have been increased so that the water could course through the pipes without overflowing and flooding.

Chester Ziemniak, the engineer who took over the Sandridge project as town engineer after Goldberg, testified he never made any plans to take care of the water that came onto the Talagas' lot. He stated, on cross-examination, it was the developers' responsibility to take care of the water flow that came from surrounding property onto the subdivision. He said if he had started the subdivision he would have given consideration to the water course so as to accomodate it. He said the flow coming onto the Talagas' property was "substantial," and a developer would have needed to have dealt with it. He explained it would not be normal for a house to have 11.6 cubic feet per second of water coming onto it.

Baker testified he knew there was a water channel coming onto the lot at the time they sold it to Piper. Baker himself built the house directly to the north and to the south of the Talagas' lot. Jordan also testified he knew drainage was coming onto the lot. Jordan testified there was a natural swale between the Talagas' property and the lot to the north of them. He said the water course was there since time began, but he did not tell Piper or the Talagas there was a massive amount of water coming onto the lot or of the foreseeability of water coming onto the lot.

Jordan and Baker presented evidence including expert testimony, to the effect that the Talagas' problem was not permanent and could be solved. Many witnesses indicated the Talagas' lot was improperly graded and the downspouts were misdirected or otherwise inadequate. A better system of swales was proposed to remedy the flooding.

The Talagas entered a home movie into evidence, which the jury viewed. Mr. Talaga provided a narration of the movie, listing the dates when it was taken and the directions and angles of the camera. It depicted Talaga walking hip and chest deep along the swale on the edge of the property.

Many photographs were entered into evidence. The Talagas presented photos described as follows:

(1) Backyard filled with water—two men wading with water almost to their knees;

(2) Backyard submerged in water;

(3) Flooded street;

(4) Driveway blocked by sand;

(5) Child under driveway (dirt under driveway washed out);

(6) Water covering basement floor (four pictures);

(7) Cracks and water stain on basement wall.

Jordan and Baker also presented many photos of the Talagas' house, driveway, and yard. These pictures purported to demonstrate the improper grading of the lot and the improper direction of the downspouts.

At trial, the Talagas testified the damage sustained by the real property included a crack in the garage floor, buckled siding on the exterior of the garage, a crack in the foundation of the house, and erosion underneath the driveway. They testified that without a water course running through the property, their house would be worth about $82,000, but with the existing water course it was worthless. Rebecca Talaga testified about $5,000 worth of personal belongings were ruined in the 1983 flood, including her wedding dress, Christmas decorations, wedding pictures, luggage, out-of-season stored clothing, baby furniture and supplies, draperies, a chest and other miscellaneous items.

The settlement agreement between the Talagas and the Town of Schererville was entered into evidence. The agreement pur-

ports to release a laundry list of potential defendants including all past, present and future town officials of Schererville. Evidence was introduced that Baker and Jordan both previously served as either elected or appointed officials of the Town of Schererville.

## DECISION

I. *Whether economic damages are appropriately awarded under a negligence theory?*

At the heart of this issue is the basic distinction between the theories of tort and contract law. The theory of negligence protects interests related to safety or freedom from physical harm, including not only personal injuries, but also damage caused by defective personal property. For example, the damages to an automobile wrecked by reason of its own bad brakes, as well as other property in the vicinity, is compensable through an action in negligence.

> "But where there is no accident, and no physical damage, and the only loss is a pecuniary one, through loss of the value or use of the thing sold, or the cost of repairing it, the court's have adhered to the rule ... that purely *economic interests* are not entitled to protection against mere negligence, and so have denied the recovery." W. Prosser, Handbook on the Law of Torts, Section 101 at 665 (4th Ed.1971).

Economic loss may be defined as "damages for inadequate value, costs of repair and replacement of the defective product, or the consequent loss of profits ... as well as the dimunition in the value of the product because it is inferior in quality ... to recover in negligence there must be a showing of harm above and beyond disappointed expectations. A buyer's desire to enjoy the benefit of his bargain is not an interest that tort law traditionally protects." *Redarowicz v. Ohlendorf* (1982), 92 Ill.2d 171, 65 Ill.Dec. 411, 441 N.E.2d 324. (citations omitted)

In *Redarowicz* a homeowner sued the builder of the home for the negligent construction of the chimney. The court affirmed the dismissal of the count in negligence holding:

> "This is not a case where defective construction created a hazard that resulted in a member of the plaintiff's family being struck by a falling brick from the chimney. The adjoining wall has not collapsed on and destroyed the plaintiff's living room furniture. The plaintiff is seeking damages for the costs of replacement and repair of the defective chimney, adjoining wall and patio. While commercial expections of this buyer have not been met by the builder, the only danger to the plaintiff is that he would be forced to incur additional expenses for living conditions that were less than what was bargained for. The complained-of economic losses are not recoverable under a negligence theory." *Id.*, 65 Ill.Dec. at 414, 441 N.E.2d at 327. (The court allowed the action to proceed under the theory of an implied warranty of habitability.)

Indiana state courts have yet to address this issue. But, the Seventh Circuit Court of Appeals predicted that our supreme court would deny a cause of action in tort for the recovery of economic losses. In *Sanco, Inc. v. Ford Motor Company* (S.D. Ind.1984), 579 F.Supp. 893, *reh.* 771 F.2d 1081, Sanco sued Ford for the cost of repairs and lost profits alleging, among other theories, the negligent design and manufacture of a fleet of trucks. The court affirmed summary judgment against Sanco on the count of negligence—Sanco's claim did go to trial under an implied warranty theory—holding:

> "The explanation for this rule is found in Justice Traynor's majority opinion in *Seely v. White Motor Co.*, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965). In *Seely*, the plaintiff sought recovery of lost profits and a refund of the purchase price of a defective truck. The California Supreme Court held that such damages, while recoverable in a breach of warranty action, were not recoverable in a strict liability action:
>
> > the distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for eco-

nomic loss is not arbitrary and does not rest on the 'luck' of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in ·distributing his products. He can appropriately be held liable for the physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm. He cannot be held for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands. A consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. He can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will. Even in actions for negligence, a manufacturer's liability is limited to damages for physical injury and there is no recovery for economic loss alone." (citations omitted). *Id.* 771 F.2d at 1084, 5.

At first blush, language in *Barnes v. Mac Brown & Co., Inc.* (1976), 264 Ind. 227, 342 N.E.2d 619 appears to place Indiana in the minority by allowing the recovery of economic losses in tort:

"The contention that a distinction should be drawn between mere 'economic loss' and personal injury is without merit. Why there should be a difference between an economic loss resulting from injury to property and an economic loss resulting from personal injury has not been revealed to us. When one is personally injured from a defect, he recovers mainly for his economic loss. Similarly, if a wife loses a husband because of injury resulting from a defect in construction, the measure of damages is totally economic loss. We fail to see any rational reason for such a distinction. If there is a defect in a stairway and the purchaser repairs the defect and suffers

an economic loss, should he fail to recover because he did not wait until he or some member of his family fell down the stairs and broke his neck? Does the law penalize those who are alert and prevent injury? Should it not put those who prevent personal injury on the same level as those who fail to anticipate it?" *Id.*, 264 Ind. at 230, 342 N.E.2d at 621.

However, *Barnes* is inapposite. *Barnes* was brought under the theory of an implied warranty of habitability and not negligence.

■ The damage to the Talagas' home, foundation, garage, and driveway were the result of years of periodic flooding. The dimunition of the fair market value of their home was attributable to the property's propensity to flooding. These damages reflect prolonged deterioration and disappointed expectations. These damages are economic in nature and therefore are not recoverable under a negligence theory.

■ Jordan and Baker admit that the damages to the Talagas' *personal property* could be recoverable under a negligence theory because of the calamitous nature of one particular flood. Nevertheless, we will not burden this opinion with further analysis under the negligence theory because these damages to personal property are compensable as consequential damages under the theory of the implied warranty of habitability upon which we affirm the verdict.

II. *Whether a professional developer who improves land for the express purpose of residential homebuilding with knowledge but without disclosure of a latent defect in the real estate that renders the land unsuitable for the purpose of. residential homebuilding breaches an implied warranty of habitability?*

■ Very little of our own authority provides us with direction in deciding this question of first impression in Indiana. However, our sister state of Illinois has experience in this area and has developed a line of cases quite rich in analysis. The culmination of this line of cases, *Lehmann*

*v. Arnold* (1985), 137 Ill.App.3d 412, 91 Ill.Dec. 914, 484 N.E.2d 473 (*appeal denied*), is closely analoguous to the case at bar.

In *Lehmann,* developers platted, subdivided, and sold an *unimproved* parcel of land to a builder. The builder constructed a home and sold it to the Lehmanns. Two creeks met at the edge of the property. These creeks were dry at the time the Lehmann's bought the home but were subject to periodic flooding during heavy rains. The periodic flooding had caused serious damage to the Lehmann's basement and had undermined the sidewalks and driveways. The *Lehmann* court affirmed the dismissal of the Lehmann's suit against the developer based in theory upon an implied warranty of habitability. We will quote a large part of the *Lehmann* decision because it succinctly describes and explains the development and rationale of the Illinois cases and the Illinois position on the present question.

"The Batemans [the developers] argue no implied warranty of habitability exists between a developer who provides unimproved land for construction of a new home and the purchaser of the home. Our supreme court first recognized an implied warranty of habitability for new homes in *Petersen v. Hubschman Construction Co.* (1979), 76 Ill.2d 31, 27 Ill. Dec. 746, 389 N.E.2d 1154. The court decided the purchaser generally cannot make a meaningful inspection of the home and, therefore, must rely on the skill and integrity of the builder-vendor. As a matter of public policy, the court decided the warranty extends to latent defects which interfere with the vendee's expectations that the house is reasonably suited for its intended use. [*Petersen* is analogous to our case of *Theis v. Heuer* (1972), 264 Ind. 1, 280 N.E.2d 300.] The plaintiffs assert the land, which the Batemans provided, is defective because their basement floods. They contend a defect in the land on which a house is built is no different than defects in other materials used in construction. They rely on *Briarcliffe West Townhouse Owners Association v. Wiseman Construction Co.* (1983), 118 Ill.App.3d 163, 73 Ill.Dec. 503, 454 N.E.2d 363. In *Briarcliffe,* a homeowners' association, which held title to common land in a planned unit development, brought an implied warranty action against the developer, who had sold townhouses to association members. The complaint alleged the developer had designed and fashioned the topography of the common land, but the land retained storm water resulting in serious damage. The court refused to accept the developer's argument that the warranty did not extend to vacant land. The court noted latent defects in the common land could affect the habitability of the townhouses. The court found no real distinction between defects in the buildings and defects in the land because in either case, the purchaser must rely on the expertise of the builder-vendor.

We agree that a builder-vendor who sells a new house and lot in a package sale should be liable not only for structural defects but also for the suitability of the site on which the house is built. (*Hesson v. Walmsley Construction Co.* (Fla.App. 1982), 422 So.2d 943). The plaintiffs ask us to extend liability on an implied warranty of habitability beyond the builder of a new home to one who sells the land to the builder. The Batemans maintain there should be no implied warranty associated with the sale of unimproved land. They cite *Witty v. Schramm* (1978), 62 Ill.App.3d 185, 19 Ill.Dec. 669, 379 N.E.2d 333, in which the plaintiffs purchased a vacant lot in a subdivision from the defendant. The plaintiffs, who had planned to build a home, excavated for a basement and encountered problems with subsurface waters. The court held there was no implied warranty of habitability applicable to the sale of unimproved land. The court reasoned that a seller of vacant land should not be placed in the position of having warranted to the buyers that they would be able to erect and maintain a home free from all problems.

In *Kramp v. Showcase Builders* (1981), 97 Ill.App.3d 17, 52 Ill.Dec. 749, 422 N.E. 2d 958, new home purchasers sued the developers of the subdivision as well as the builder for breach of the implied warranty of habitability. The plaintiffs alleged soil conditions in the subdivision were inadequate for installation and operation of their septic systems. The developers relied on *Witty* and argued there is no warranty of habitability for vacant land. The court decided *Witty* did not control its decision. The court believed the warranty did protect purchasers from defects arising out of soil conditions. The court, however, went on to note that no case had extended the warranty beyond the builder-vendor to vendee relationship. Because such a relationship did not exist between the developer and the plaintiffs, the court decided the developer could not be held liable under an implied warranty of habitability.

*Kramp* was decided before *Redarowicz v. Ohlendorf* (1982), 92 Ill.2d 171, 65 Ill. Dec. 411, 441 N.E.2d 324. In *Redarowicz*, the supreme court extended the warranty of habitability to allow subsequent purchasers of the home to recover for latent defects which manifest themselves within a reasonable time after the purchase. The court decided that while the warranty has its roots in the execution of the contract for sale, it exists independently, and privity is not required. The court stated:

> 'Like the initial purchaser, the subsequent purchaser has little opportunity to inspect the construction methods used in building the home. Like the initial purchaser, the subsequent purchaser is usually not knowledgeable in construction practices and must, to a substantial degree, rely upon the expertise of the person who built the home.' 92 Ill.2d 171, 183, 65 Ill.Dec. 411, 417, 441 N.E.2d 324, 330. [The *Redarowicz* decision is analogous to our case of *Barnes, supra.*]

The plaintiffs conclude the *Kramp* court would now allow recovery from the seller of unimproved land for the inhabitability of a home later built on that land because *Redarowicz* eliminated any privity requirement. While *Redarowicz* expanded the class of possible plaintiffs who can bring an implied warranty action, the opinion does not suggest the class of possible defendants should be expanded beyond the builder-vendor. The reason for the extension in *Redarowicz* does not support the extension that the plaintiffs urge. A subsequent purchaser must rely on the expertise of the builder because that purchaser cannot make a meaningful inspection and cannot rely on the initial purchaser. A purchaser, however, need not and does not rely on any expertise of the seller of the land. Instead, he relies on the builder's skill to insure that the home built on the property will be habitable. Moreover, it would be unfair to impose a warranty of habitability on the seller of unimproved land for a house that has not yet been built. *As between the seller and the builder, the doctrine of caveat emptor should apply.* To impose a later warranty in favor of the purchaser of the house would require the seller of land to control the actions of the builder. The habitability of a new home will still be determined by the type and quality of construction despite any defects in the land." *Id.* 91 Ill.Dec. at 917, 918, 484 N.E.2d at 476, 477. (Emphasis added)

We are impressed with the rationale of the Illinois cases and especially the *Lehmann* decision. However, we believe that the application of the doctrine of *caveat emptor* to the sale of land between Jordan and Baker and Bruce Piper, the builder, works a manifest injustice to the Talagas. Certain distinguishing facts in the present case and relevant authority from other jurisdictions compel us to reach a result opposite that of the *Lehmann* court.

The absence of knowledge or the absence of negligence in discovering the latent defect by the developer is an important factor in this type of case. In *Witty, supra,* (cited in *Lehmann*) the developers of the *unimproved* lot were not charged with the knowledge of excessive subsurface water or the attendant consequences thereof.

The court refused to impose an implied warranty of habitability against the developers holding they were not at fault or responsible for the natural condition of subsurface water being present because they had no special knowledge of the complained of defect that would make it incumbent upon them to repair or correct it. Apparently, special knowledge of the defect would have imposed a duty upon the developer to repair or correct.

Similarly, in *Cook v. Salishan Properties, Inc.* (1977), 279 Or. 333, 569 P.2d 1033, the court refrained from imposing an implied warranty of habitability upon the leasors/developers of *unimproved* seaside lots which sustained severe erosion damage. The court held the developers were not at fault because they were not negligent in failing to discover the land's unsuitability for residential construction or in failing to warn of the danger of erosion.

The decisions from two other states are worthy of note because they hold the implied warranty of habitability applies to the sale of land from a developer. *Hinson v. Jefferson* (1975), 287 N.C. 422, 215 S.E.2d 102; *Rusch v. Lincoln–Devore Testing Laboratory, Inc.* (Colo.App.1984), 698 P.2d 832. In *Hinson,* the property purchased for the purpose of building a home was subject to restrictive covenants that limited its use to the construction of a residential home. No sewer hookup was available in the area and although neither developer or purchaser had prior knowledge, the soil was unsuitable for the installation of a sewer or septic system. The court granted the purchaser rescission holding the developer breached an implied warranty of habitability arising out the restrictive covenants because the land was entirely valueless for the only purpose allowed under the restrictive covenants. That is, the land was valueless for homebuilding.

In *Rusch,* builder/homeowners sued the developer who sold an unimproved lot on the site of a manmade fill. Movement of the fill beneath the home caused extensive structural damage to the home. The verdict in favor of the homeowners was reversed because the jury awarded cumula-

tive damages based on both theories alleged, negligence and an implied warranty of habitability. However, on remand the appellate court instructed the trial court to conduct the trial consistent with the following holding:

"Accordingly, we hold that if land is improved and sold for a particular purpose, if vendor has reason to know that the purchaser is relying upon the skill or expertise of the vendor in improving the parcel for that particular purpose, and the purchaser does in fact so rely, there is an implied warranty that the parcel is suitable for the intended purpose." *Id.* 698 P.2d at 835.

The facts and circumstances of the present case are particularly appropriate for the imposition of an implied warranty of habitability. Jordan and Baker did more than sell raw land. They platted, subdivided, and engineered considerable improvements for Sandridge Estates. They put in the sanitary sewers, the storm sewers, and streets; they rough graded the lots all for the express purpose of facilitating the building of homes.

Jordan and Baker are professionals in real estate development and other aspects of the real estate business. Jordan is a real estate broker and developer. He has sold approximately one thousand homes during his career. He has participated in the development of seven subdivisions— four in Schererville.

Baker is a builder and real estate developer. He has built approximately three hundred homes during his career. He has participated in the development of seven subdivisions—four in Schererville.

Jordan's real estate company handled the sale of the home in question from Bruce Piper to the Talagas. Baker built the homes directly to the north and south of the Talagas. As the developers of Sandridge with knowledge of the water channel problem, Jordan and Baker were in the best position to leave the lot in question undeveloped. As the developers of Sandridge, they are in the best position to absorb the loss attributable to the latent,

undisclosed defect in the real estate they sold.

Jordan and Baker knew about the natural water channel but chose to develop the property anyway. Ample evidence was presented that would enable the jury to conclude—consistent with the testimony of the Talagas' expert, Lippman,—that the lot should never have been developed for homebuilding.

We believe that under the circumstances, the application of the rule of caveat emptor as in *Lehmann, supra* to the original sale of the lot works a grave injustice upon the Talagas. Also, unscrupulous developers would be vested with impunity to develop marginal and unsuitable land. Homeowners would be left without a remedy for latent undisclosed defects in real estate not chargeable to the builder. We believe the following language used by our supreme court in abolishing the rule of caveat emptor in the sale of new homes is applicable in the present context. "The caveat emptor rule as applied to new houses is an anachroism patently out of harmony with modern home buying practices. It does a disservice not only to the ordinary prudent purchaser but to the industry itself by lending encouragement to the unscrupulous, fly-by-night operator and purveyor of shoddy work." *Theis v. Heuer* (1972), 264 Ind. 1, 8, 280 N.E.2d 300, 304. Accordingly, we affirm the jury verdict upon the theory of an implied warranty of habitability.

III. *Whether the Talagas gave timely notice to Jordan and Baker as required for recovery under the theory of an implied warranty of habitability?*

 Jordan and Baker contend they should not be held liable under an implied warranty of habitability because the Talagas did not give them timely notice and a reasonable opportunity to cure. We agree that notice of the breach of an implied warranty of fitness for habitation is a condition precedent to recovery. There is no particular form for giving notice of the defect, but the purchaser must at least inform the vendor of the problem and give him a reasonable opportunity to cure it.

*Wagner Const. Co., Inc. v. Noonan* (1980), Ind.App., 403 N.E.2d 1144.

The evidence most favorable to the verdict reveals that the Talagas informed Jordan immediately when the first incident of a water problem revealed itself to them in February, 1976, only a few months after they had moved into their new house. Jordan's response, after seeing the water, was to place the responsibility for the problem back onto the Talagas by telling them to have the lot regraded. Piper, instead, who described the situation as "bad," helped them to dig a ditch to drain the water away.

Later, in April, 1976, the Talagas, who planned to add a garage, again telephoned Jordan to inquire when the drainage system would be in place; they were told it would be put in when the weather was dry. Although an underground pipe was installed that year, there was conflicting testimony at trial whether a swale was cut on the easement above the pipe.

There was testimony that the Talagas engaged in various activities over the following years to correct the problem. Neighbors testified they assisted in cleaning up the debris that washed away and collected in the street each time there was a heavy rain. The Talagas testified about how the Fire Department had also helped to pump away the water that stood in their backyard. They also testified that they had appealed to the Town regarding the problem at a time when Baker was an official of the Town. Baker explained that notice in his capacity as town official was different than notice as developer. Finally, they consulted an attorney who wrote Jordan and Baker, and then later instituted legal action.

It is axiomatic that questions of reasonableness belong exclusively to the jury. It is likewise axiomatic that we as a court of review do not reweigh the evidence. Abundant evidence of notice and an opportunity to cure was presented to the jury. The jury was appropriately instructed pursuant to the law of *Wagner*.[4] We will not over-

4. Final Jury Instruction No. 6 reads in pertinent part:

turn the jury's finding the Talagas provided Jordan and Baker with reasonable notice and a reasonable opportunity to cure.

## IV. *Whether the $74,000.00 verdict is supported by evidence?*

■ The jury received only the following instruction with respect to damages:

"If you find for the plaintiffs on the question of liability, you then must determine the amount of money which will fairly compensate plaintiffs for those elements of damage which were proved by the evidence to have resulted from the wrongful conduct of defendants.

Where personal property is completely or partially destroyed, the measure of the damages is the fair market value of the property at the time of its damage or destruction.

Where real property is destroyed or the enjoyment of the use of said property significantly impaired, the measure of damages is the difference in the fair market value of the real estate before and after the destruction or damage.

The measure of damages for nonpermanent injury to real estate equals the cost of restoration.

You are to determine whether these elements of damage have been proved by a consideration of the evidence relating to damages. Your verdict must be based on that evidence and not on guess or speculation."

The house was sold to the Talagas for $42,500.00; the jury awarded damages of $74,000.00. It is clear from the arguments in the parties' briefs and the size of the jury's award that the damages were based on the market value of the home at the time of trial and not the purchase price.

■ We note at the outset this instruction is inappropriate for an award based on an implied warranty of habitability. The implied warranty of habitability has arisen out of the recognition that the process of home buying is deserving of protections similar to those afforded to the purchases of personal property. *Theis, supra.* An implied warranty is a contract theory and as such damages are fixed as of the time of breach. *Coyle Chevrolet Co. v. Carrier* (1980), Ind.App., 397 N.E.2d 1283. Therefore, the damages in this case, computed upon the market value of the home at the time of trial are inappropriate. We note the measure of damages appropriate for recovery under an implied warranty of habitability should be analogous to the measure of damages recoverable under an implied warranty of merchantability, that is, the difference between the value as warranted less the value at the time of acceptance plus incidental and consequential damages. *Id.*[5] We note further that an award of prejudgment interest would have been appropriate in this case because the deprivation of the appreciation of one's house is substantially similar to the deprivation of the use of money. *Fort Wayne Nat. Bank v. Scher* (1981), Ind.App., 419 N.E.2d 1308.

■ The instruction given in the case at bar would have been appropriate as a measure of damages to real property recoverable under a tort theory. *Gene B. Glick Co., Inc. v. Marion Construction Corp.* (1975), 165 Ind.App. 72, 331 N.E.2d 26. The tort theory of damages is inappropriate in the case at bar because it would enable the Talagas to delay the commencement of their suit during a period the property values would be expected to appreciate in order to recover a larger award. This is inconsistent with the duty to mitigate contract damages. *Salem Communi-*

---

"This warrant extends to subsequent purchasers for latent defective construction. But for the subsequent buyer to prevail, he must give reasonable notice to defendants after discovery of the defect to allow defendants the opportunity to repair the defect and reduce damages.

The burden of proof is on the plaintiffs to prove by a preponderance of the evidence the defendants' negligence and that the plaintiffs gave defendants reasonable notice of the defect."

5. We note there are two formulae available for the computation of damages under an implied warranty of habitability in Landlord/Tenant cases. *Welborn v. Society for Propogation of Faith* (1980), Ind.App., 411 N.E.2d 1267. But, these measures based upon rental values, are unworkable in cases based upon sales of real estate.

*ty School Corp. v. Richman* (1980), Ind. App., 406 N.E.2d 269.

 However, Jordan and Baker failed to claim any error in the above instruction in their motion to correct errors or in their brief. Error has not been preserved. The above instruction has become the law of the case. *Bud Wolf Chevrolet, Inc. v. Robertson* (1987), Ind.App., 508 N.E.2d 567 (*reversed on other grounds*).

 Returning to Jordan's and Baker's challenges to whether the evidence supported the damage award, we first address their allegation that the Talagas failed to meet their burden in proving the damage to the real estate was permanent. We cannot look inside the minds of the jurors to see whether the award was based on permanent damages or the cost of restoration. *Symon v. Burger* (1988), Ind.App., 528 N.E.2d 850. However, based on the size of the verdict it is a fair assumption the award was based on a measure of permanent damages. We will assume so for the purposes of this opinion.

The heart of this question is whether the water could be successfully and permanently diverted away from the property. Jordan and Baker assert the evidence revealed a system of swales could be installed that would divert the water away from the house and thus the damage was nonpermanent and the Talagas are entitled to a lower measure of damages. On the other hand, the Talagas presented evidence that water would stand in the street for two days after a heavy rain before draining away.

There was sufficient evidence to support an award based on permanent damages because the jury could have believed that no system of swales could have improved the Talagas' situation because the storm sewers in the street were inadequate to service the large volume of water that coursed through their property. The jury was not bound to accept Jordan's and Baker's evidence about the system of swales. *Symon, supra.* We do not reweigh the evidence; we find no error.

 Jordan and Baker next attack the valuation of the Talagas' house. Both Talagas testified the house would have been worth $82,000 but for the water problem. Thomas Talaga testified the house was worthless because it could not be sold with the problem. Jordan and Baker assert the Talagas had never attempted to sell their house and therefore could not say it would not sell. They also point to the fact the Talagas lived continuously in the house rebutting their assertion the house was worthless. They argue the award was based upon mere speculation, conjecture, or guesswork and must be reversed. *Whiteco Properties, Inc. v. Thielbar* (1984), Ind. App., 467 N.E.2d 433.

 The owner of real estate is assumed to possess sufficient acquaintance with it to estimate the value of the property although his knowledge of the subject matter would not qualify him if he were not the owner. *Harper v. Goodwin* (1980), Ind.App., 409 N.E.2d 1129. Also, the Talagas' expert, Lippman, testified the Talagas' lot should never have been developed for homebuilding with such a large stream flowing onto it—that the lot was useless with this problem. The jury heard the evidence and was instructed. Because the award was within the bounds of the evidence, we find no error. *Symon, supra.*

 Finally, Jordan and Baker assert no evidence was presented to support an award for loss of personal property. We cannot open a general verdict and separate the various awards. *Symon, supra.* Because the award was within the bounds of the evidence presented on the real property alone, we cannot assume the Talagas were compensated for any loss of personal property. Therefore, we find no error.

V. *Whether the instruction advising the jury of a ten year statute of limitations erroneously invaded the jury's province?*

Jury instruction 11 contained the following recitation of IND.CODE 34-4-20-2:

"In 1975, there was in full force and effect the following statute in the State of Indiana:

Ten year limitation for deficiency in construction of improvements. No action to recover damages whether based upon contract, tort, nuisance, or otherwise,

(a) for any deficiency, or alleged deficiency, in the design, planning, supervision or observation of construction of an improvement to real property, or

(b) for an injury to property, either real or personal, arising out of any such deficiency, or

(c) for injury to the person or for the wrongful death, arising out of any such deficiency, shall be brought against any person performing or finishing the design, planning, supervision or observation of construction of an improvement to real property, unless such action is commenced within ten (10) years from the date of substantial completion of such improvement."

Jordan and Baker contend that this statute is inapplicable in the present case and its erroneous inclusion requires the reversal of the verdict because it invaded the province of the jury to determine the reasonable period for notice as required for recovery under the theory of an implied warranty of habitability. (Analyzed under Issue III) They argue the jury could have been misled into assuming the statute sets ten years as a reasonable period for notice to be given.

I.C. 34–4–20–2 is known as a statute of repose. It sets a cap on the maximum time limit allowed for the commencement of an action without expanding the regular statute of limitation or reasonable time period for providing notice applicable to the underlying cause of action. The statute of repose simply provides that suit must be commenced within 10 years measured from the substantial completion of an improvement regardless of when the cause of action accrues. Therefore, if defects are discovered or an injury occurs 10 years after the date of substantial completion, a party is effectively barred from suit. *Berns Const. Co., Inc. v. Miller* (1986), Ind.App., 491 N.E.2d 565 (*affirmed* (1987), Ind., 516 N.E.2d 1053).

Jordan and Baker hired Goldberg to engineer the improvements in 1974. The Talagas brought suit in 1983. I.C. 34–4–20–2 is inapplicable to the case at bar because the entire saga unfolded within 10 years. Instruction 11 is not an ambiguous or erroneous statement of the law. Instead, it is superfluous and as such its inclusion is erroneous.

Jordan and Baker rely on *Princeton Coal Co. v. Dowdle* (1924), 194 Ind. 262, 142 N.E. 419 for the proposition that an instruction which invades the province of the jury constitutes reversible error. In *Princeton*, three jury instructions *assumed facts* which were in dispute (the lawfulness of the plaintiff's presence and the scope of the defendant's employment). The court held these jury instructions displaced the jury's function as the finder of the true state of facts in reversing the verdict.

*Princeton* is distinguishable from the case at bar. Instruction 11 merely contained a superfluous recitation of *statutory law*. As such, it did not require the jury to *assume disputed facts*. It did not invade the fact finding province of the jury. "Juries are composed of men and women of reasonable intelligence and understanding, and courts recognize that they are able to understand the import and meaning of the instructions given to them." *Childs v. Rayburn* (1976), 169 Ind.App. 147, 158, 346 N.E.2d 655, 663. "When an instruction is not mandatory in nature, it must be considered with all of the other instructions given to the jury and ambiguity, inaccuracy or incompleteness of one instruction may be cured by another instruction not inconsistent therewith." *Estate of Hunt v. Board of Com'rs, Henry County* (1988), Ind.App., 526 N.E.2d 1230, 1236. We believe the above rule to be equally applicable in the case at bar where the challenged instruction is not ambiguous, inaccurate, or incomplete but superfluous.

Instruction 6 adequately instructed the jury concerning the issue of the reasonable notice requirement. (See footnote 3) Instruction 6 cured any ambiguity or usurpation of jury function created by instruction

11. The inclusion of instruction 11 is harmless error.

VI. *Whether Jordan and Baker were released from suit along with the Town of Schererville?*

 In consideration of $7,000.00, the Talagas entered into the following covenant-not-to-sue with the Town of Schererville (reproduced in pertinent part only):

## "COVENANT NOT TO SUE

This COVENANT NOT TO SUE, executed this 19th day of December, 1985, by Thomas Talaga and Rebecca Talaga.

### WITNESSETH THAT:

WHEREAS, Thomas Talaga and Rebecca Talaga are plaintiffs, and the Town of Schererville is a defendant in an action pending in the Lake Superior Court, Room Number Two in Crown Point, Indiana, before Special Judge James Letsinger, under Cause Number 283–1583 styled *Thomas Talaga and Rebecca Talaga v. Town of Schererville, Robert J. Britton, Jr., Dan Jordan, Allie Baker and Bruce Piper, Individually and d/b/a Piper Enterprise, Inc., and Piper Enterprise, Inc.;* (emphasis in original)

\*　\*　\*　\*　\*　\*

WHEREAS, plaintiffs desire to continue the lawsuit against the other defendants, and do not intend that the consideration paid by the Town of Schererville for this settlement constitute a complete satisfaction of all claims which they now have or may hereafter have against anyone other than the Town of Schererville, its corporate bodies, the Schererville Plan Commission, the American States Insurance Company, the Board of Zoning Appeals, the Town of Schererville Utility Board, all zoning commissions associated with the Town of Schererville, the Town of Schererville Utility Superintendent, the Town of Schererville Board of Trustees, all governmental entities, divisions, commissions and boards associated with the Town of Schererville, all employees and agents, past and present of the Town of Schererville, and all past, present and future elected and/or appointed officials of the Town of Schererville, and the respective heirs, successors, assigns and insurers for all of the above persons and entities, for the losses resulting therefrom, in that the parties are both aware of the fact that other persons and entities may be responsible for the injuries suffered by the plaintiffs and may ultimately be held responsible for those injuries alleged to have been suffered by the plaintiffs;" [6] (The laundry list appears again as redundancy later in the covenant).

Jordan and Baker were both past elected or appointed officials of the Town of Schererville. As such, they have seized upon the phrase, "all past, present and future elected and/or appointed officials of the Town of Schererville," to assert that they were released by the covenant. They do not argue that the Talagas intended to release them from the lawsuit. They argue that the document is unambiguous and as such its clear meaning operates to release them.

"Where the terms of a contract are clear the court merely applies its provisions. Unambiguous language is conclusive upon the parties to the contract and the courts. If the language of the instrument is unambiguous the intent of the parties is determined from its four corners. Parol or extrinsic evidence is inadmissible to expand, vary or explain the instrument unless there has been a showing of fraud, mistake, ambiguity, illegality, duress or undue influence. A contract is ambiguous only if a reasonable person could find its terms susceptible to more than one interpretation." *Turnpaugh v. Wolf* (1985), Ind.App., 482 N.E. 2d 506, 508, 509. (citations omitted)

In the present case the trial judge properly found the release to be susceptible to more than one interpretation, that it was

---

**6.** We admonish Jordan's and Baker's attorneys to make appropriate citations to the record pursuant to Ind.Rules of Procedure, Appellate Rule 8.2(B)(5). Much judicial time and energy was wasted searching the record for the covenant which was inconspicuously buried as a defendants' exhibit on page 1356 of the 1956 page long transcript.

ambiguous, and properly submitted the question to the jury. The document contains an underlined list of the defendants in the lawsuit including the Town of Schererville, Dan Jordan, and Allie Baker. At the beginning of the "Whereas" clause in question, the Talagas expressly reserved the right to proceed against the other defendants. It is a specious argument to assert that the *only* reasonable interpretation of the document is that Jordan and Baker were to be released with the Town of Schererville from the Talagas' lawsuit. The ambiguity was resolved by the jury in the Talagas' favor.

VII. *Whether introduction of the Talagas' home movie was erroneous?*

 At trial, the Talagas were permitted to show a home movie depicting a flood scene at their home in 1984 narrated by Thomas Talaga. The movie showed water flooding in the street and yard. It depicted Thomas wading along the natural swale in water knee to chest deep.

Jordan and Baker assert the introduction of the movie was error because it failed to depict what it was intended to portray, was cumulative and therefore was prejudicial. They complain that the jury could have been misled into believing that this scene, described as occurring after a "heavy rain," was the typical aftermath of every rain.

The marshalling of evidence is a matter of trial court discretion. Reversible error cannot be predicated upon a trial court's admission or exclusion of evidence which is merely cumulative. *Thompson v. Best* (1985), Ind.App., 478 N.E.2d 79 (*trans. denied*). Our standard being abuse of discretion we will reverse only if the trial court has drawn an erroneous conclusion clearly against the logic and effect of the facts and circumstances or the reasonable and actual deductions to be made from such evidence. *Estate of Hunt, supra.*

The movie depicted exactly what it was represented to depict—a view of the Talagas' yard and street during a particularly serious flooding in 1984. We imagine the jury was quite impressed with the movie. But, highly probative evidence is not neces-

sarily erroneously prejudicial. We find no abuse of discretion in the admission of Talagas' home movie.

For all of the foregoing reasons, we affirm.

CONOVER, P.J., and STATON, J., concur.