GREG ALLEN CONSTRUCTION COMPANY, INC., and Greg Allen Individually, Appellants–Defendants,

v.

Daniel L. ESTELLE and Sondra E. Estelle, Appellees–Plaintiffs,

Banc One Mortgage Corp., and Bank One Indiana, Appellees–Cross Defendants.

No. 54A01–0009–CV–300.

Court of Appeals of Indiana.

Jan. 11, 2002.

James E. Ayers, Gwyneth Ayers, Wernle, Ristine & Ayers, S. Bryan Donaldson, Crawfordsville, IN, Attorneys for Appellants.

Harry A. Siamas, Collier, Homann & Siamas, Crawfordsville, IN, Todd H. Belanger, Jennifer D. McNair, Wood Tuohy Gleason Mercer & Herrin, Indianapolis, IN, Attorneys for Appellees.

## OPINION

BAILEY, Judge.

### Case Summary

Greg Allen Construction Company, Inc. ("Allen Construction") and Greg Allen, individually ("Allen"), defendants and counter- and cross-claim plaintiffs below, appeal the trial court's separate judgments for Daniel and Sondra Estelle (collectively, "the Estelles"), plaintiffs and counter-claim defendants below, and for Banc One Mortgage Corp. ("BOMC") and Bank One, Indiana ("Bank One"), cross-claim defendants below. In addition, Allen Construction and Allen, as well as their attorney,

James E. Ayers ("Ayers"), in his individual capacity, appeal the trial court's order directing them to pay attorney fees. Finally, the Estelles challenge the trial court's determination that Allen was not personally liable for the Estelles' damages. We affirm in part and reverse in part.

### Issues

Allen Construction and Allen identify sixteen issues for our review, and the Estelles raise two cross-issues. We consolidate, restate and reorder the issues presented as follows:

I. Whether the trial court erred by entering judgment in favor of the Estelles on their claims against Allen and Allen Construction;

II. Whether the trial court erred by failing to hold Greg Allen personally liable for the Estelle's damages;

III. Whether the trial court's award of damages to the Estelles was supported by the evidence;

IV. Whether the trial court's entry of summary judgment in favor of the Estelles on Allen Construction's amended counter-claim to enforce its mechanic's lien should be set aside;

V. Whether the trial court erred by finding that BOMC and Bank One were not liable to Allen Construction and Allen; and

VI. Whether the trial court's award of attorney fees was improper.

### Facts and Procedural History

In 1996, the Estelles decided to renovate a home they owned in Ladoga, Indiana. In August of that year, they went to the Bank One branch office in Crawfordsville to secure financing for the project. They spoke with BOMC employee Chris McGaughey, whose office was located within the

bank, and on October 18, 1996, they completed an application for a $70,000 loan, to be secured by the real estate. The Estelles then contacted Allen Construction for an estimate, and on October 22, 1996, Allen furnished a document denoted "Quote # 1101," which projected that the work would cost $53,982.16. On October 25, 1996, Allen presented Sondra Estelle with a document entitled "Work Order # 207," which provided that Allen Construction would perform the work outlined in Quote # 1101. The work order further stated that "unless other arrangements are made," the Estelles would pay Allen Construction one-third of the quoted amount of $53,982.16 before Allen Construction began work, one-third when half of the work was completed, and the remaining third when the job was finished. Sondra Estelle expressed her concern that the documents did not fully describe the work she and Allen had discussed. Allen assured her that all of the work was covered under the contract, and Sondra Estelle signed the document. The Estelles, however, had apparently not secured financing, and Allen Construction agreed to accept a down payment of $1,000.00 to begin work. The Estelles paid this amount on November 5, 1996. Allen Construction then provided the Estelles with a document dated November 6, 1996, which referenced Work Order # 207 and further detailed the work to be done at the house.

The Estelles subsequently presented McGaughey of BOMC with a copy of Quote # 1101 and Work Order # 207 along with its November 6 attachment. McGaughey advised the Estelles that they would not qualify for the loan unless the appraised value of the home including the proposed renovations was at least $100,000.00, and McGaughey arranged for an appraisal. McGaughey also told the Estelles that BOMC would not finance the project under the terms set out in the documents prepared by Allen Construction. Instead, McGaughey gave the Estelles a document entitled Contract for Rehabilitation of Dwelling House and advised that the Estelles and Allen Construction needed to execute the document as part of the loan application and approval process. The document recited that it was a contract between the Estelles and Allen Construction, but contained different terms than Work Order # 207. For example, rather than providing for three payments with the first due prior to commencement of the work, the BOMC contract stated that Allen Construction would be paid following the completion of an inspection report specifying that the work had been satisfactorily completed. The agreement further provided that periodic partial payment draws might be allowed, again subject to satisfactory inspection reports. (McGaughey advised the Estelles to secure Allen Construction's agreement to accept five equal payments, with each payment to be made as the project progressed an additional twenty percent. At some point, McGaughey gave the Estelles several blank documents entitled "Construction Loan Disbursement Request" and told the Estelles to have Allen Construction fill them out and fax them to McGaughey to request payment. McGaughey told the Estelles that the bank would arrange for inspections to confirm that the work had progressed at least twenty percent before releasing each payment to the Estelles to pay Allen Construction. The BOMC contract also provided that Allen Construction would waive any rights it might have to a lien on the property in connection with its work. McGaughey gave the Estelles documents entitled "Waiver of Lien," which reiterated that Allen Construction agreed to waive its lien rights. McGaughey advised the Estelles to give the forms to Allen Construction for

completion and submission to McGaughey along with the loan disbursement forms.

On November 19, 1996, McGaughey and the Estelles learned that the value of the property with the proposed renovations would be only $89,000, not enough to qualify for the requested loan. McGaughey helped the Estelles secure alternative financing, and on November 26, 1996, Bank One approved a line of credit for the Estelles. While this loan came from Bank One and not BOMC, the Estelles understood that McGaughey would administer the line of credit, and that the BOMC contract, and particularly the provisions relating to periodic payment draws and lien waivers, would govern disbursements from the line of credit.

Allen Construction commenced work on December 5, 1996. At this point, Allen Construction had only been paid $1,000.00, and the company, which had not yet been presented with the BOMC contract, remained unsure of the status of the Estelles's efforts to obtain financing. On December 6, in response to Allen Construction's demands for additional cash to fully begin the project, the Estelles paid Allen Construction an additional $6,000.00, which was not drawn from the Bank One line of credit. Allen Construction continued working. On December 10, 1996, the Estelles presented Greg Allen with a copy of the BOMC contract and told him that they would be unable to obtain funding for the renovations unless he agreed to the terms set out in the document. They also gave Allen the loan disbursement forms and lien waiver forms and instructed him to forward those to McGaughey for payment draws in 20% installments, and explained that McGaughey would arrange for inspections to confirm that the project had made appropriate progress. Believing Allen Construction would not otherwise be paid for its work, Greg Allen

signed the BOMC agreement on December 10. The Estelles closed on their line of credit loan with Bank One on December 18, 1996.

That same day, Allen Construction faxed McGaughey two lien waiver forms and two payment request forms, each for $10,796.43, 20% of the 53,982.16 contract price, for a total of $21,529.86. McGaughey had an appraiser from Don R. Scheidt & Co. visit the property to confirm the progress of the work. On December 20, the appraiser advised McGaughey that the work was 40% complete, and on December 23, Bank One issued a check for $21,592.86 payable to Allen Construction. The Estelles picked up the check from the bank and delivered it to Allen Construction. The work continued, and on January 3, 1997, Allen Construction faxed McGaughey a lien waver form and a third payment request seeking a 20% draw of $10,796.43. An appraiser determined that the project was 60% complete on January 7, 1997, and identified work that would need to be completed for the project to be 80% finished. Bank One issued Allen Construction a check in the amount of $10,796.43 the next day.

As the work progressed, the Estelles began to question the quality of Allen Construction's work. Around February 24, 1997, the Estelles told Allen that they were not satisfied with the quality of the work done on the home's walls, and Allen told them that the work would be corrected. Allen Construction submitted a fourth payment request to McGaughey on February 24, again for $10,796.43, as well as a lien waiver form. An Allen Construction worker performed some repairs on the walls around this time, but the work was apparently not done to the Estelles' satisfaction. The inspector dispatched by McGaughey examined the house and advised McGaughey on March 3 that Allen

Construction had completed the items previously identified by the appraiser, and that the project was 80% complete. The inspector, however, reported that the quality of Allen Construction's workmanship on the walls was poor, and required additional work. The inspector identified various items, including the installation of all floor covering, that would have to be satisfactorily completed for the project to be considered 100% complete.

The Estelles spoke with McGaughey about their concerns with the quality of Allen Construction's work. They asked the bank to approve a $10,796.43 draw from the line of credit as Allen Construction requested. The Estelles, however, feared that Allen Construction would fail to complete its work and that the Town and Country Homecenter would not be paid for carpet it had been asked to supply. The Estelles thus instructed McGaughey to have the draw amount split between two checks, one of which was to be issued to Allen Construction, and the other to Town and Country Homecenter to pay for the carpet. On March 4, 1996, Bank One issued a check to Allen Construction in the amount of $5,893.43, and one to Town and Country for $4,903.00, and gave the checks to the Estelles for delivery. The Estelles then contacted Greg Allen and again demanded that Allen Construction fix the problems with the walls before they released the check. Greg Allen advised that Allen Construction would not return until the fourth payment draw was released. The Estelles did not pay Allen Construction, and on March 11, 1996, Allen Construction filed a Notice of Mechanics Lien with the Montgomery County Recorder. At some point, the Estelles returned both checks to Bank One.

On March 13, 1997, the Estelles wrote to Allen Construction identifying various items they felt needed to be corrected or completed, and advised that if those items were not corrected, the Estelles would consider Allen Construction in default under the contract and proceed to have the work corrected and finished by someone else. The parties then hired lawyers, and the lawyers exchanged letters over the following several weeks. The Estelles advised that they wanted the work identified in their March 13, 1997 letter done, while Allen Construction claimed that some of the items were not contemplated in the original contract, and demanded to be paid the 80% draw amount before returning to the home.

The parties did not resolve their differences, and on May 12, 1997, the Estelles filed their Complaint alleging that Allen and Allen Construction breached the contract by failing to complete the project, failing to perform the work that was done in a suitable manner, and by filing a mechanic's lien in violation of the agreement. Allen and Allen Construction responded by asserting a counter-claim against the Estelles, seeking enforcement of the mechanic's lien, and claiming that the Estelles breached the contract by failing to pay the 80% draw.[1] Allen and Allen Construction also filed a cross-claim against BOMC, asking BOMC to answer to any interest it had in the Estelles' property. On May 16, 1997, the Estelles moved the court to enter summary judgment against Allen and Allen Construction on their mechanic's lien claims. The court granted the Estelles' motion and entered judgment discharging the lien on August 28, 1997. On February 13, 1998, Allen and Allen Construction amended their counter-claim and cross-claim to include allegations that BOMC breached certain duties it owed under the contract between the parties, and that

1. Allen Construction and Allen do not address the claim in their brief.

BOMC was liable to Allen and Allen Construction under theories of fraud and promissory estoppel.

The court bifurcated the issues between the Estelles and Allen Construction and Allen, from those between Allen and Allen Construction and BOMC, and held a bench trial on the Estelles' claims on February 17–18 and April 14–15, 1998. The court next held a bench trial on Allen and Allen Construction's claims against BOMC and Bank One on February 11, 1999.[2] The court issued separate judgments on April 21, 1999. In its judgment for the Estelles and against Allen Construction and Greg Allen, individually, the trial court found that Allen Construction and Allen breached its contract by performing substandard work and by failing to correct and complete its work. The trial court awarded the Estelles damages as follows:

> The court finds that a reasonable cost for Estelles to have the below standard work corrected and to finish the project is $57,704.15. The court finds that Allen should have a credit against that amount to the amount Estelles were obligated to pay under the original contract plus extras which they did not pay. That amount is calculated as follows:

| | |
|---|---|
| Amount Estelles owed Allen for completing the contract plus extras | $60,461.44 [3] |
| Amount Estelles paid Allen | $43,705.79 |
| Balance available as a credit against Estelles' damages | $16,755.65 |

Estelles should recover from Allen the sum of $37,948.50 plus costs of the action.

(R. I. 209.) [4]

In its separate judgment in favor of BOMC and Bank One, the trial court ruled that BOMC and Bank One were not obligated under the contract or under principles of promissory estoppel to disburse funds from the line of credit to Allen Construction, and rejected the allegations that BOMC and Bank One were liable under theories of fraud, constructive fraud, and criminal deception. The trial court found all of these claims to be groundless and unreasonable, and awarded BOMC and Bank One attorney's fees, expenses, and costs.

On May 21, 1999, Allen Construction and Allen filed a Motion to Correct Errors, arguing in part that the trial court erred by finding that Greg Allen was individually liable for the Estelles' damages. On August 26, 1999, the trial court vacated its judgment against Allen, finding that Allen's individual liability was not at issue at trial and remained subject to litigation. The trial court continued the matter for a later determination on that question and on the issue of attorney's fees. The trial court eventually heard these matters on April 19, 2000, and on July 25, 2000, the trial court awarded BOMC and Bank One

---

**2.** It appears that on or around April 13, 1998, BOMC filed a motion for summary judgment requesting in part that Bank One should be joined to the suit. It appears that on July 21, 1998, the trial court granted an unidentified party's motion to stay or in the alternative to strike BOMC's motion for summary judgment. While it is unclear if Bank One was ever formally joined to the action, the court and parties treated Bank One as an additional party at the trial on the claims against BOMC, and, as noted below, the trial court entered judgment in favor of both BOMC and Bank One on those claims.

**3.** The contract price was originally $53,982.16, but the trial court concluded that the ultimate contract price came to $60,461.44, an increase of $6,479.28. The parties do not dispute the figure.

**4.** There are two records in this case. The first, which consists of seven volumes, will be referenced as "R. I." The second one-volume record will be identified as "R. II."

$9,820.00 in attorneys fees and expenses. The trial court separately entered judgment for Allen, concluding that there was no basis upon which to hold him personally liable for the Estelles's damages. This appeal ensued.

## Discussion and Decision

### I. Judgments for the Estelles

#### A. Standard of Review[5]

Allen Construction appeals the court's judgment in favor of the Estelles on their claims. On appeal of a bench decision, the reviewing court will not set aside the judgment unless it is clearly erroneous. Ind. Trial Rule 52(A). In this case, the trial court issued its judgment for the Estelles in narrative form. Although the trial court's findings and conclusions are not separated into numbered paragraphs, they are evident from the trial court's judgment. In reviewing the trial court's judgment, we first determine whether the evidence supports the findings, and then whether the findings support the judgment. *Indiana Farmers Mut. Ins. Co. v. Ellison*, 679 N.E.2d 1378, 1380 (Ind.Ct.App.1997). Neither party asked the court to make specific findings, and to the extent that the court's findings do not cover a particular issue, a general judgment standard applies, under which we may affirm the trial court on any theory supported by the evidence. *Id.* at 1381. We neither reweigh the evidence nor judge the credibility of witnesses. *Mutual Hosp. Services, Inc. v. Burton*, 695 N.E.2d 641,

643 (Ind.Ct.App.1998). Rather, we consider only the evidence and reasonable inferences that support the judgment, and will disturb the judgment only if the record is devoid of facts or inferences to support it. *Id.*

#### B. Analysis

The trial court concluded that Allen Construction breached its contract with the Estelles by failing to perform in a workmanlike manner and by failing to correct and complete its work. Allen Construction argues that it was forced to suspend its performance because the Estelles failed to pay the 80% draw amount as required by the parties' agreement. Allen Construction does not appear to challenge the trial court's finding regarding the quality of its work. The apparent thrust of Allen Construction's argument is that if it had been paid, it would have continued working and could have corrected any deficiencies. The Estelles respond by claiming that Allen Construction had no right to suspend performance because it was not entitled to the 80% draw under the parties' agreement. In particular, the Estelles note that Work Order No. 207 specified that Allen Construction was to be paid in thirds, and that Allen Construction had already been paid in excess of two-thirds the contract price when it stopped work. According to the Estelles, Allen Construction was not to have been paid the final third of the contract price until the work was completed. The Estelles further argue that they were justified in withholding

---

**5.** Allen Construction identifies sixteen issues, but does not identify a single standard governing our review of those issues. This is not consistent with Indiana Appellate Rule 46(A)(8)(b), which provides that the argument section of a brief "must include for each issue a concise statement of the applicable standard of review...." We recognize that this appeal is governed by the former appellate rules because it was initiated prior to January 1, 2001, the effective date of our current appellate rules, and that the former rules do not contain a corollary to current Appellate Rule 46(A)(8)(b). Nevertheless, a party upon appeal should always cite to the applicable standard of review. A party's recognition of the appropriate review standard not only helps this Court review issues, but also helps counsel better focus their arguments.

further payments because Allen Construction breached its agreement to complete the project in a workmanlike manner.

■ The Estelles' position that the project was governed by the payment schedule from Work Order No. 207, which provided for three installment payments, is incorrect. The work order stated that its payment schedule would apply "unless other arrangements are made." (R. I. 1138). The parties made other arrangements. In particular, the Estelles obtained Allen Construction's assent to the terms of the BOMC contract, which provided as follows:

> 4. *PAYMENT.* It is understood by [Allen Construction] and [the Estelles] that BOMC is holding part, if not all, of the funds borrowed by or granted to [the Estelles] for payment of the Contract price herein. Inspector shall prepare an inspection report when the work specified has been satisfactorily completed. BOMC shall sign off on said report and then shall release the funds due [Allen Construction].
>
> . . . .
>
> 5. *PARTIAL PAYMENTS.* Partial payments may be allowed contingent on satisfactory work progress and sufficient quantity and quality under the terms of the specifications. All partial payments will be based on a percentage of the total dollar amount of all completed contract work.

(R. I. 1124.) The parties agreed that the contract price would be paid in partial installments. While these particular arrangements were not memorialized in a written document, parties to a contract may modify their agreement either orally or through their conduct. *Gilliana v. Paniaguas,* 708 N.E.2d 895, 897 (Ind.Ct. App.1999), *trans. denied.* The parties here expressly agreed, as their conduct confirms, to modify the payment schedule to provide for five equal payments, and to utilize the lien waiver and inspection process demanded by the bank.

■ As noted above, Allen Construction requested the fourth, or 80%, installment payment on February 24, 1997, and the inspector promptly determined that the project was 80% complete. The Estelles withheld payment. Allen Construction maintains that pursuant to the parties' modified agreement, it was entitled to the 80% draw once the appraiser selected by the bank confirmed that the project was 80% complete. According to Allen Construction, the Estelles breached the agreement by failing to pay the 80% installment draw, and this breach justified Allen Construction's refusal to complete the project. Allen Construction is correct that, in general, if a property owner fails to pay a contractor as required under the contract, the contractor may suspend its performance on the project. *Abbey Villas Dev. Corp. v. Site Contractors, Inc.,* 716 N.E.2d 91, 100 (Ind.Ct.App.1999), *trans. denied.* However, this rule by its own terms operates only when the contractor's right to payment is mandated by the agreement, and when the owner's non-payment constitutes a breach of contract. *See id.* at 101–02 (noting that "the evidence supports the trial court's determination that Developer first breached the contract by its failure to make payments under the contract and, accordingly, Contractor was justified in suspending its performance due to Developer's breach.") *See also Burras v. Canal Const. and Design Co.,* 470 N.E.2d 1362, 1365–66 (Ind.Ct.App.1984) (holding that a contractor was justified in suspending performance after the property owner refused to pay and attempted to alter the agreed-upon payment scheme when the contract unambiguously required payment).

■ Here, Allen Construction's right to payment of the 80% draw was not abso-

lute or unqualified, and the Estelles's failure to pay was not a per se breach of the agreement. Rather, the provisions quoted above plainly show that partial payments would be made only in the event of "satisfactory work progress and sufficient quantity and quality under the terms of the specifications." (R. I. 1124.) The contract provided that the "specifications" consisted of collateral documents describing the work to be performed. In this case, the specifications consist of Work Order No. 207, its November 6, 1996 attachment, and Quote No. 1101. In Work Order No. 207, Allen Construction promised to complete its work "in a workmanlike manner according to standard practices." In the construction context, the phrase "workmanlike manner" means that the work must be done as a skilled workman would do it. *Id.* A contractor's failure to perform in a workmanlike manner may constitute a breach of contract. *Id.* Thus, Allen Construction was contractually obligated to perform its work in a workmanlike manner, and under the contract, its receipt of payment for its work was conditioned on its workmanlike performance, as well as the extent of its progress.

Allen Construction does not take issue with its obligation to perform in a workmanlike manner. Allen Construction argues, however, that the inspector's determination that the project was 80% complete necessarily constituted a determination that the quality of the project was sufficient, at least for that degree of progress, and that Allen Construction was therefore entitled to the 80% draw under the contract. The Estelles, of course, found the quality insufficient and withheld payment. Allen Construction argues that the Estelles, who were, in Allen Construction's words, "unskilled, unprofessional, opinionated, and biased," had no business evaluating the quality of the work. (Appellants' reply brief at 7.)

Rather, according to Allen Construction, only the inspector who verified the project's progress had authority to verify the quality of the work necessary to require payment at each successive stage.

The BOMC contract, however, expressly provided:

> H. *REPAIR DEFECTS IN WORK.* Neither an inspection report, any provision in the Contract documents, or partial or entire occupancy of the premises by [the Estelles] shall constitute an acceptance of the work not done in accordance with the contract documents, nor relieve the Contractor of liability in respect to any expressed warranties or responsibility for faulty workmanship or materials. Unless otherwise specified, all materials shall be new and both materials and workmanship shall be of a quality acceptable to [the Estelles] and BOMC, according to the rehabilitation specifications.

(R. I. 1127.) The contract further provided that the Estelles "were responsible for the monitoring of the contracted construction work and the stopping of such work, if found defective. . . ." (R. I. 1127.) These provisions establish that the Estelles were to be the judges of the quality of Allen Construction's work, and had the right under the contract to accept or reject the work regardless of the results of an inspection report. Allen Construction contends that this reading of the parties' agreement is inappropriate because it gives the Estelles unilateral and unchecked power to withhold payment. As Allen Construction recognizes, however, a party to a contract involving requirements of commercial quality, operative fitness or mechanical utility may condition its obligation to pay upon that party's satisfaction that the other party's performance meets the applicable standard. *Willig v. Dowell,*

625 N.E.2d 476, 482 (Ind.Ct.App.1993), *partially vacated on other grounds on reh'g,* 627 N.E.2d 1365 (Ind.Ct.App.1994). A party's evaluation of the other party's performance under these criteria will be judged against a reasonable person standard, and dissatisfaction may not be claimed arbitrarily, capriciously, or unreasonably. *Id.* A party should be satisfied with another party's performance if a reasonable person in the same circumstances would be satisfied. *Id.* A home construction contract necessarily involves commercial quality and operative fitness. *Id.* These concepts were plainly incorporated in the present contract through the requirement that Allen Construction perform in a workmanlike manner. The Estelles, who were authorized under the contract to accept or reject the quality of Allen Construction's work, were accordingly the party ultimately empowered to determine whether partial payments would be disbursed, subject to the requirement that they act reasonably, and not arbitrarily or capriciously.

█ Allen Construction contends that the Estelles' rejection of the work's quality, and their refusal to pay, was unreasonable because the Estelles failed to give Allen Construction the opportunity to correct the problems they identified. Again, we disagree. There was ample evidence from which the trial court could have concluded that the Estelles gave Allen Construction the chance to fix the defective work. First, around March 10, 1997, the Estelles asked Allen Construction to fix certain items, but Allen Construction refused, demanding the 80% draw as a condition to return. Further, on March 13, 1997, the Estelles wrote to Allen Construction advising that they were exercising their rights under the termination provision of the BOMC contract. The Estelles' letter quoted the termination provision in full as follows:

14. *Termination.* If [Allen Construction] fails to furnish materials or execute work satisfactorily according to the rehabilitation specifications and in accordance with the provisions of this contract, then upon ten (10) days' written notice to [Allen Construction], [the Estelles] in conjunction with BOMC or BOMC alone shall have the right to declare [Allen Construction] in default. Unless within five (5) days after the service of said notice, the violation shall cease or satisfactory arrangement shall have been made for its correction and [Allen Construction] shall be in default and his right to proceed under this Contract is terminated. In the event that [Allen Construction] is in default, [the Estelles], in conjunction with BOMC, will proceed to have the work completed, and shall apply to the cost of having the work completed any money due to [Allen Construction] under the contract, and [Allen Construction] shall be responsible for any damages resulting to Owner by reason of default.

(R. I. 1145.) The Estelles advised Allen Construction that its work was "not satisfactorily completed" in the following areas:

Overall general workmanship on drywall

Overall general workmanship on electrical

Overall general workmanship on doors and windows installation

Overall general workmanship on floor and ceiling joists

Overall general workmanship on wall frame construction

General preparation for floor covering

Overall construction of living room floor

Overall general workmanship on construction and staining of trim work

Overall general workmanship installing or not installing cabinets

Not installing proper keyed entry lock on North door

Reimbursement of funds for supplies

Refusal to supply plumbing and electrical from well to inside house

Overall installation of heating supply

Needed to supply gas line in kitchen

Overall general workmanship on finishing on entire house

(R. I. 1145–46.) The Estelles advised Allen Construction that "[a]ll of these items are to be remedied to satisfy" them. (R. I. 1146.) Allen Construction was unquestionably provided the opportunity to return to the home and address the identified concerns, as the Estelles and their attorney had repeatedly requested before filing the present action. Allen Construction refused to do so until paid the 80% draw amount.

█ Allen Construction next argues that the Estelles' objection to the quality of these items was unreasonable because the items identified constituted most, if not all, of the work done as of that date. There does not appear to be any provision in the contract documents limiting the Estelles' right to accept or reject the quality of the work to a particular portion or percentage of the project, and Allen Construction does not explain why a property owner may not reasonably find every bit of a contractor's work to be inadequate. The Estelles presented ample evidence establishing that the bulk of the work Allen Construction did prior to walking off the project was not workmanlike. Robert Porter, a licensed architect, visited the house in mid-March 1997, and testified that the overall quality of Allen Construction's work was so poor that the house at that time was not fit for human habitation. In particular, Porter observed that the living room ceiling sagged significantly due to an insufficiently strong floor joist, and that as a result of this defect, the ceiling could collapse. Porter testified about similar shortcomings in the kitchen and dining room ceilings. He also noted that the stairway was inadequate and violated the applicable building code in that the treads slanted downward and were not level, and protruded too far beyond the risers. In addition, the stairway's handrail was too low and the risers were not of uniform height. Porter also indicated that the drywall work in the house was of inadequate quality, as evidenced by sagging pieces, protruding nails, and visible joints and tape seals. The architect further discussed related problems with the paint job throughout the house, which was mostly done with flat paint, but which had been touched up in spots with glossy paint, leaving a visibly uneven finish. According to Porter, the trim work around the house was also not done in a workmanlike manner. In particular, the trim was poorly cut, unevenly joined and badly finished. Also, the outlets in the home were not placed at uniform heights, and were not spaced consistent with building code requirements. In addition, Porter testified that Allen Construction left a two-inch height difference between the kitchen and dining room floor, presenting a dangerous tripping hazard. The floors were also not level. Further, the master bedroom closet was crooked and the ceiling was slanted. Porter concluded that all of these defects were inconsistent with local building practices. Another contractor confirmed much of Porter's testimony.

The trial court was entitled to conclude from these facts that Allen Construction failed to perform in a workmanlike manner. The Estelles were entitled under the contract to decline to accept Allen Constructions' work as not workmanlike and refuse payment, and in light of the evidence, we cannot say that the Estelles acted unreasonably, arbitrarily or capri-

ciously. Allen Construction was therefore not justified in suspending its performance because the Estelles withheld the 80% payment. Having been afforded the opportunity to remedy the identified defects as provided under the contract, Allen Construction was obligated to resume performance. This it did not do. The trial court's conclusion that Allen Construction breached its agreement to perform in a workmanlike manner and to complete the construction project is supported by the evidence and the findings, and the court's judgment for the Estelles is affirmed.

## II. Personal Liability of Greg Allen

### A. Standard of Review

The Estelles argue that the trial court erred by declining to hold Greg Allen individually liable for their damages. In its separate judgment on this issue, the trial court entered detailed findings of fact and conclusions of law, apparently on its own motion. We therefore first determine whether the evidence supports the findings, and then whether the findings support the judgment, and to the extent that the court's findings do not cover a particular issue, a general judgment standard applies, under which we will affirm the trial court on any theory supported by the evidence. *Indiana Farmers Mut. Ins. Co.,* 679 N.E.2d at 1380–81. Pursuant to Trial Rule 52(A), we may not reverse unless the court's judgment is clearly erroneous.

### B. Analysis

The Estelles sued Allen and Allen Construction, alleging that both defendants breached the parties' contract and that Allen's individual work on the project was negligent and of poor quality. As noted above, the trial court initially found both defendants liable, but subsequently entered a judgment concluding that Allen was not personally liable. The Estelles argue that Allen should be individually liable because he personally engaged in

the conduct that gave rise to the Estelles's damages. The Estelles further argue that if Allen's acts were inseparable from those of Allen Construction, the corporate veil should be pierced to hold Allen personally liable.

■■■ The personal liability of corporate officers and shareholders like Allen is determined by common law rules of agency. *See Winkler v. V.G. Reed & Sons, Inc.,* 638 N.E.2d 1228, 1231 (Ind.1994). Corporate officers and shareholders are generally not liable for the contractual obligations of the corporation because under agency rules, the remedy of one seeking to enforce a contract is against the principal and not the agent. *Id.* The same rule, however, does not apply to tortious acts, because an agent who commits a tortious act is equally liable with the principal. *See Tolliver v. Mathas,* 538 N.E.2d 971, 976 (Ind.Ct.App.1989) (holding that an agent and a principal are jointly liable for an agent's conduct and may be joined as defendants). Thus, while a corporate officer or shareholder will generally not be personally liable for the torts of the corporation or of its other officers or agents merely by virtue of the person's office, the officer or shareholder may be personally liable for the company's torts in which the officer or shareholder has participated or which he has authorized or directed. *State of Indiana Civil Rights Comm'n v. County Line Park, Inc.,* 738 N.E.2d 1044, 1050 (Ind.2000).

■■■ The trial court ostensibly ruled only that the defendants breached their contract, and that Allen should therefore not be personally liable under the rules set out above. However, while the parties' contract provided that Allen Construction was obligated to perform in a workmanlike manner, this obligation need not have been expressed, as "[t]he law implies a duty in

every contract for work or services that the work or services will be performed skillfully, carefully, diligently, and in a workmanlike manner." *Mullis v. Brennan,* 716 N.E.2d 58, 64 (Ind.Ct.App.1999). Thus, when a person contracts to perform services, failure to perform in a workmanlike manner may constitute both a breach of contract and the tort of negligence. *Wilson v. Palmer,* 452 N.E.2d 426, 429 (Ind.Ct.App.1983). Accordingly, since Allen Construction was subject to the common law duty to perform its work in a workmanlike manner, the trial court's conclusion that the company breached this duty necessarily constitutes a conclusion that Allen Construction was negligent. Under the rule from *State of Indiana Civil Rights Comm'n* set out above, Allen could have been personally liable for his company's negligent failure to do the job in a workmanlike manner to the extent that he participated in, authorized or directed Allen Construction's negligent conduct.

■■■ The trial court's findings and conclusions include the following:

### FINDINGS OF FACTS

. . . .

2. Greg Allen is a shareholder, director, and the President and Treasurer of Greg Allen Construction Company, Inc. . . .

. . . .

11. Greg Allen is an employee and President of Greg Allen Construction Company, Inc.

12. Greg Allen estimated and bid this job. He was on the job every day and supervised each step of the project and all the work. Greg Allen designed all the structural changes including the free span floor joist system of the bedroom over the living room, the floor system of the living room and the stairway to the second floor. Greg Allen did all the electrical, plumbing, and carpentry work and installed all the windows.

13. Greg Allen also did most of the drywall taping and finishing and most of the painting, although some of his helpers assisted him with those tasks.

14. Much of Greg Allen's work has been found to be of poor quality, below standard for the industry, failed to meet the standard of "good and workmanlike" and was not acceptable to the Estelles.

. . . .

### CONCLUSIONS OF LAW

. . . .

3. That Greg Allen is not individually liable to the Plaintiffs in this matter, due to the fact that he was acting as President and an employee of Greg Allen Construction Company, Inc. while he was working on this project.

. . . .

(R. II. 50–54.) Allen and Allen Construction do not dispute the court's findings of fact, and they are amply supported by the evidence. The trial court's findings show that Greg Allen personally participated in, directed, or authorized all of the activities that the trial court had found to violate Allen Construction's duty to perform in a workmanlike manner. Given these findings, the court's conclusion that Allen was not personally liable for the Estelles's damages was clearly erroneous and must be reversed. Because we conclude that the trial court should have found Allen individually liable for his participation in the company's negligence, we need not address the Estelles's claim that the trial court erroneously failed to hold Allen liable by disregarding Allen Construction's corporate form.

### III. The Estelles' Damages

#### A. Standard of Review

 Allen Construction challenges the court's award of damages to the Estelles. Our review of an award of damages is limited. We do not reweigh the evidence or judge the credibility of witnesses, and we will consider only the evidence favorable to the award. *Abbey Villas Development Corp.*, 716 N.E.2d at 101. A damage award must be supported by probative evidence and cannot be based on mere speculation, conjecture, or surmise. *Id.* A party injured by a breach of contract is limited in his recovery to the loss actually suffered, and may not be placed in a better position than he would have enjoyed if the breach had not occurred. *Id.* Thus, a damage award must be referenced to some fairly defined standard, such as cost of repair, market value, established experience, rental value, loss of use, loss of profits or direct inference from known circumstances. *Id.* We will reverse an award only when it is not within the scope of the evidence before the finder of fact. *Id.*

#### B. Analysis

As noted above, the court determined that it would cost the Estelles $54,704.15 to fix and finish the work, and awarded the Estelles $37,948.50 after crediting Allen Construction with the amount of the contract price the Estelles avoided. Allen Construction argues that the trial court's award is excessive and unreasonable because it leads to economic waste and because it permits the Estelles to recover for items not included in the parties' agreement.[6]

 A party injured by the breach of a construction contract may recover either (1) the difference between the value of the building or work as completed and what the value would have been had the work been done in accordance with the contract, or (2) the reasonable cost of correcting the defects to make the work conform to the contract. *Pierce v. Drees*, 607 N.E.2d 726, 729 (Ind.Ct.App.1993). The trial court awarded the Estelles damages using the second measure. Damages based upon the cost of correction and repair are generally available if "the defects may be remedied without taking down and reconstructing a substantial part of the building, or [if] the defects could be repaired at a reasonable cost, or, as it is often stated, [if] construction and completion would [not] involve unreasonable economic waste." *Sanborn Electric v. Bloomington Athletic Club*, 433 N.E.2d 81, 89 (Ind.Ct.App.1982).

 Economic waste has been found in situations where the cost of restoring the property would exceed the value of the property in its restored condition, where usable property is destroyed, where the cost to repair would result in unreasonable duplication of effort, and where the contractor's work would be substantially undone. *Willie's Const. Co., Inc. v. Baker*, 596 N.E.2d 958, 961 (Ind.Ct.App. 1992) (citations omitted). Reconstructing a contractor's work will not, however, result in economic waste unless the restoration substantially destroys the building. *Id.* Economic waste will be found only in "extreme cases." *Id.* "The breaching contractor has the burden of proving that curing defects would cause economic waste and any reasonable doubt will be resolved against him." *Id.*

---

6. While Allen Construction raises these issues, it does not challenge the trial court's calculation of damages or the specific amount awarded, acknowledging that "the Court's ultimate figure is within the range of the evidence...." Brief at 17.

First, while the court's award contemplates that much of Allen Construction's work would have to be re-done, there was ample evidence that the home would not be useable unless the remediation took place, and there is no indication that these repairs would substantially destroy the building. Further, Allen Construction has not identified any evidence showing that the cost of repairs would exceed the value of the home. Moreover, Allen Construction has failed to establish that the trial court's award was economically wasteful in relation to the other possible measure of damages. As noted above, the alternative to correction and repair damages are damages for the difference between the value of the building or work as completed and what the value would have been had the work been done in accordance with the contract. A contractor challenging a trial court's award of repair damages on the ground that the award is economically wasteful must produce evidence that the difference in value measure would result in a lower damage award than the repair measure. *See Sanborn Elec. Co.*, 433 N.E.2d at 90 (explaining that a contractor was obligated to establish difference in value to show the economic waste resulting from repair damages, and to obtain difference in value damages). If there is any evidence in the record from which the trial court could have established the difference between the value of the Estelles' home as of the date Allen Construction stopped working, and the value the home would have had if it had been completed according to the contract, Allen Construction has not identified it. The trial court could therefore reasonably conclude from the evidence that the repairs necessary to fix Allen

Construction's work were not economically wasteful, and we cannot say that its award was erroneous on this basis.

As for Allen Construction's claim that the trial court awarded damages to repair items not contemplated in the initial contract, most of the evidence at trial, including the scope of the parties' contract, was in significant dispute. Sondra Estelle testified that Greg Allen assured her that the contract included all of the items the Estelles desired, and that the absence of any items from the contract documents was not a problem. The trial court was entitled to accept this testimony, and to conclude that the items requiring correction were items included within the parties' agreement.

IV. Summary Judgment for the Estelles

Allen Construction attempts to challenge the trial court's August 28, 1997 entry of summary judgment in favor of the Estelles on Allen Construction's amended counter-claim to enforce its mechanic's lien.[7] The court's order was entered as an appealable final judgment pursuant to Trial Rule 54(B). Allen Construction, however, declined to appeal. It appears from the record that on June 17, 1998, Allen Construction filed a Motion for Relief from Summary Judgment pursuant to Trial Rule 60, claiming to have discovered new evidence during trial. Allen Construction has not provided this Court with any argument regarding this purported issue, but rather "incorporates the Motion and Argument set out" in the record "and asks that the Court consider said argument and authorities." We will not. Under the former Appellate Rules, which govern this case because Allen Construction initiated this appeal before January 1, 2001, an

---

7. This claim is found in Allen Construction's brief at the end of the section dealing with Allen Construction's arguments that the trial court erred by entering judgment for BOMC and Bank One. However, the claim is unrelated to those issues, and we therefore address it separately here.

appellant was required to place its argument in its brief, and the argument was to

> contain the contentions of the appellant with respect to the issues presented, the reasons in support of the contentions along with citations to the authorities, statutes and parts of the record relied upon, and a clear showing of how the issues and contentions in support thereof relate to the particular facts of the case under review.

Former Appellate Rule 8.3(7).[8] Allen Construction may not evade this requirement by referring us to arguments found in a brief filed at some earlier point in the case. *See Pluard ex rel. Pluard v. Patients Compensation Fund*, 705 N.E.2d 1035, 1038–39 (Ind.Ct.App.1999) (holding that an attempt to incorporate an entire argument raised and argued in the trial court by reference in a footnote does not comply with either the letter or the spirit of former Appellate Rules), *trans. denied.* Having presented no argument for our consideration, Allen Construction has waived the issue.

## V. Judgment for BOMC and Bank One

### A. Standard of Review

 Allen Construction appeals the court's judgment in favor of BOMC and Bank One on Allen Construction's cross-claims. Where a party has the burden of proof at trial and an adverse judgment is entered, if the party prosecutes an appeal, he or she does so from a negative judgment. *J.W. v. Hendricks County Office of Family and Children*, 697 N.E.2d 480, 481 (Ind.Ct.App.1998). To prevail on an appeal from a negative judgment, the appellant must establish that the judgment is contrary to law. *Cutshall v. Barker*, 733 N.E.2d 973, 978 (Ind.Ct.App.2000). A judgment is contrary to law when the evidence is without conflict and all reasonable inferences to be drawn from the evidence lead to only one conclusion, but the trial court reached a different conclusion. *Id.* In addressing whether a negative judgment is contrary to law, we consider only the evidence most favorable to the prevailing party and do not reweigh the evidence or judge the credibility of witnesses. *Id.*

In its judgment for BOMC and Bank One, the trial court entered findings of fact and conclusions of law on its own motion. As noted above in the first section of our analysis, when we review the trial court's findings we first determine whether the evidence supports the findings, and then whether the findings support the judgment, and to the extent that the court's findings do not cover a particular issue, a general judgment standard applies, under which we may affirm the trial court on any theory supported by the evidence. *Id.* at 1381. *Indiana Farmers Mut. Ins. Co.*, 679 N.E.2d at 1380.

### B. Analysis

#### 1. Promissory Estoppel

 The trial court rejected Allen Construction's claim that Bank One was liable for the remaining unpaid twenty percent of the contract price under a theory of promissory estoppel. Under the doctrine of promissory estoppel, when a person makes a promise to another, and the other person takes some action in reliance upon the promise, which action should have reasonably been expected, the promise may be enforced to avoid injustice. *Weinig v. Weinig*, 674 N.E.2d 991, 997 (Ind.Ct.App. 1996). A claim of promissory estoppel

---

**8.** The requirements of former Appellate Rule 8.3(7) are embodied in current Appellate Rule 46(A)(8), which contains a more comprehensive and detailed description of the requisite form of the argument section of an appellant's brief. Our determination that Allen Construction's purported argument is insufficient would be the same under the new rules.

consists of the following elements: (1) a promise by the promissor, (2) made with the expectation that the promisee will rely thereon, (3) which induces reasonable reliance by the promisee, (4) of a definite and substantial nature and (5) injustice can be avoided only by enforcement of the promise. *Id.*

■ Allen Construction appears to contend that BOMC and Bank One were obligated under the contract to disburse money directly to Allen Construction, and that by insisting that the parties use the BOMC contract, BOMC and Bank One promised to pay Allen Construction the entire contract amount and promised to hold what Allen Construction characterizes as its money in escrow. First, contrary to Allen Construction's claims, BOMC and Bank One were not parties to the agreement. The contract expressly states that the only parties were Allen Construction and the Estelles. It is true, as Allen Construction points out, that the BOMC contract identified BOMC as an "escrow agent." It is clear from the contract, however, that the bank was not obligated by virtue of its role as an escrow agent to disburse funds to Allen Construction. The escrow agent provision reads:

18. *BOMC AS ESCROW AGENT.* [Allen Construction] and [the Estelles] agree that BOMC is merely an Escrow Agent and is not responsible for work performed hereunder or conditions permitting performance of the work, or payment for said work, but that [the Estelles] and [Allen Construction] shall be solely and fully responsible for such matters and shall be subject to legal and equitable remedies and all remedies expressed in this Contract. [The Estelles] and [Allen Construction] agree not to sue BOMC for such matters, but to pursue action only against each other when necessary, and only after seeking reme-

dial action under the terms of the Contract herein.

(R. I. 1128). Significantly, the provision states that the Estelles, and not BOMC, were responsible for paying Allen Construction. Thus, if BOMC was holding money for anyone, it was for the Estelles. Even if BOMC and Bank One were parties under the contract with some obligation to pay Allen Construction directly, this obligation would have been no more absolute than it was for the Estelles who, as has been explained in detail above, had the authority to determine whether or not to disburse the funds to Allen Construction. The bank's right to withhold payments upon the Estelles's determination that the quality of Allen Construction's work was not sufficient is confirmed by the contract provision that reads "BOMC may withhold any contract amount, in whole or in part, to such extent as may be necessary to protect [the Estelles] from loss on account of the following reasons: . . . a) Defective work not remedied." (R. I. 1124.) Thus, BOMC's requirement that the Estelles and Allen Construction use the contract as a condition for approving the Estelles's financing did not constitute BOMC's promise to pay Allen Construction.

■ Allen Construction also asserts that Bank One's disbursement of the first three of the five installment payments after receiving the inspector's progress report amounted to Bank One's promise that it would release the remaining two draws upon confirmation from the inspector that the work had progressed sufficiently. Again, however, the terms of the contract plainly indicated that Allen Construction's entitlement to each payment was subject to the Estelles's approval of the work. Thus, the bank's disbursement of a portion of the contract price draw did not establish Allen Construction's unqualified right to further draws and did not constitute the

bank's promise to release the remainder of the funds.[9] The trial court did not err in rejecting Allen Construction's promissory estoppel claim.

### 2. Statutory Deception

At trial, Allen Construction claimed that Bank One was liable for violating the criminal deception statute. Indiana Code section 35–43–5–3 defines criminal deception to include the misapplication of "entrusted property ... or property of a credit institution in a manner that the person knows is unlawful or that the person knows involves substantial risk of loss or detriment to either the owner of the property or to a person for whose benefit the property was entrusted;...." A person may bring a civil action to recover pecuniary losses suffered as a result of the violation of the criminal deception statute under Indiana Code section 34–24–3–1. At trial, Allen Construction claimed that BOMC employee Christine McGaughey misapplied the funds to be disbursed from the Bank One line of credit by failing to place the entire loan amount in an escrow account, and by failing to pay the remainder to Allen Construction.

 The trial court found Bank One not liable in part because there was no evidence that McGaughey acted with criminal intent. Allen Construction correctly notes that criminal intent is not an element of criminal deception. Rather, the only mental element required to be shown here was McGaughey's knowledge that the manner in which she misapplied the line of credit involved a substantial risk of loss or detriment to Allen Construction. Allen Construction fails to recognize, however, that the trial court rejected the criminal deception claim for other reasons. In par-

ticular, the trial court noted that by extending the line of credit, the bank simply loaned the Estelles money, and that under the BOMC contract, the Estelles had the ultimate authority to determine whether or not to disburse the loaned funds to Allen Construction. Under these circumstances, the trial court found Allen Construction's position that it either "owned" the line of credit, or that the line of credit had been entrusted for Allen Construction's benefit, to be "incomprehensible." (R. I. 205.) We agree.

Once again, the Estelles borrowed money from Bank One in the form of an open line of credit. The Estelles separately contracted with Allen Construction to remodel their house. The parties agreed that Allen Construction would be paid in five equal installments, with payment subject to the Estelles's reasonable determination that the work was of a sufficient quality. As we explained above, to the extent Bank One had any obligation to disburse funds or to hold funds in escrow, these obligations ran to the Estelles pursuant to the loan agreement, and not to Allen Construction. The funds Bank One loaned to the Estelles were not the property of Allen Construction and were not entrusted for Allen Construction's benefit, and Bank One did not misapply the funds by failing to place them in an escrow account. The trial court did not err by rejecting Allen Construction's criminal deception claim.

### VI. Attorneys Fees

#### A. Standard of Review

 The trial court awarded BOMC and Bank One attorneys fees under Indiana Code section 34–52–1–1, which permits an award of fees incurred defending against frivolous, unreasonable, or

---

**9.** Allen Construction further claims that the trial court erred by concluding that Allen Construction did not rely upon any promises made by the bank. Because we conclude that the bank did not make the alleged promises, we do not reach this issue.

groundless claims, and claims asserted in bad faith. Our review of a trial court's award under this statute involves several steps and standards. *Scott v. Randle*, 736 N.E.2d 308, 312 (Ind.Ct.App.2000). We first review the court's factual findings under the clearly erroneous standard. *Id.* Next, we review the court's legal conclusions de novo. *Id.* Finally, we review the court's decision to award fees, as well as the court's determination as to the amount of the award, for an abuse of the court's discretion. *Id.*

### B. Analysis

Litigants generally must pay their own attorney fees in the absence of a statute, stipulation or agreement providing otherwise. *Scott*, 736 N.E.2d at 312. In its answer to Allen Construction's amended cross-claim and counter-claim, BOMC alleged that Allen Construction's claims were frivolous, groundless, and unreasonable, and requested attorney fees pursuant to Indiana Code Section 34–52–1–1, which provides as follows:

(a) In all civil actions, the party recovering judgment shall recover costs, except in those cases in which a different provision is made by law.

(b) In any civil action, the court may award attorney's fees as party of the cost to the prevailing party, if the court finds that either party:

(1) brought the action or defense on a claim or defense that is frivolous, unreasonable, or groundless;

(2) continued to litigate the action or defense after the party's claim or defense clearly became frivolous, unreasonable, or groundless; or

(3) litigated the action in bad faith.

A claim is frivolous if it is made primarily to harass or maliciously injure another, if counsel is unable in good faith to make a rational argument on the merits, or if counsel is unable in good faith to support the action by a rational argument for the extension, modification, or reversal of existing law. *Fisher v. Estate of Haley*, 695 N.E.2d 1022, 1029 (Ind.Ct.App.1998). A claim is unreasonable if no reasonable attorney would consider it justified or worthy of litigation under the totality of the circumstances, including the law and facts known at the time the claim is filed. *Id.* A claim is groundless if the claim is unsupported by any facts. *Id.* Lastly, a claim is made in bad faith if a party presents it with furtive design or ill will. *Id.*

At trial, Allen Construction sought to hold BOMC liable under theories of fraud, constructive fraud, promissory estoppel, and criminal deception. The trial court rejected all of these claims, and specifically found that each was so unsupported in fact or law that no reasonable attorney would have presented them. As noted above, Allen Construction has appealed the trial court's judgment on the promissory estoppel and criminal deception claims, and here takes issue with the court's conclusion that those claims were unreasonable and groundless. Allen Construction has not, however, challenged the court's judgment on the fraud and constructive fraud claims, or the trial court's determination that those claims were unreasonable or groundless. Thus, the court's attorney fee award, at least to the extent that it is based on Allen Construction's fraud and constructive fraud claims, must be affirmed.

We also affirm the trial court's fee award as it relates to Allen Construction's promissory estoppel and criminal deception claims. As noted above, there was no evidence that the bank promised to pay Allen Construction the entire contract amount, to hold that amount in escrow, or to automatically disburse installments upon completion of an inspection report as

Allen Construction claimed. Nor was there any evidence that Allen Construction either owned the line of credit, or that the line of credit had been entrusted for Allen Construction's benefit, as was required to establish criminal deception. Rather, the contract Allen Construction signed clearly provided that BOMC had no obligation to pay Allen Construction and was merely holding money loaned to the Estelles in escrow for payment by the Estelles to Allen Construction upon the Estelles's reasonable determination that the quality of Allen Construction's work was sufficient. Under these circumstances, we cannot say that the trial court erred by finding that Allen Construction's promissory estoppel and criminal deception claims lacked any basis in law or fact, and we agree that in the absence of such factual or legal support, no reasonable attorney would have presented those claims. The trial court therefore did not abuse its discretion by awarding BOMC and Bank One attorney's fees.

■ Allen Construction states that even if the fee award was warranted, the amount was unsupported by the evidence. Allen Construction, however, presents no argument on the question in its brief, but rather asks this Court to refer to a brief in the record previously filed with the trial court. For the reasons discussed above in connection with Allen Construction's purported argument regarding the trial court's entry of summary judgment in favor of the Estelles on Allen Construction's mechanic's lien claims, we will not. As above, Allen Construction has presented no argument, and the issue is waived.

### Conclusion

In conclusion, we hold that the trial court did not err by determining that Allen Construction breached its agreement to complete the home renovation project, and

to perform in a workmanlike manner. We reverse, however, the trial court's judgment that Greg Allen was not individually liable for the company's breach of contract because it was clearly erroneous. We conclude that Allen Construction and Allen have waived any issue regarding the trial court's entry of summary judgment for the Estelles on the mechanic's lien claims by failing to present an argument. Further, the trial court's award of damages to the Estelles was within the evidence, and must be affirmed. The trial court's determination that BOMC and Bank One were not liable under theories of promissory estoppel and criminal deception was likewise not contrary to law, and is affirmed. Finally, the trial did not err by awarding BOMC and Bank One attorney's fees incurred defending against Allen Construction's cross-claims.

Affirmed in part and reversed in part.

KIRSCH, J., concurs.

BROOK, C.J., dissents as to issue II with separate opinion.

BROOK, Chief Judge, dissenting as to issue II.

I respectfully dissent from the majority's conclusion that Allen can be personally liable for negligence in this case. Because the Estelles suffered only economic loss, their remedy lies exclusively in contract, and neither Allen Construction nor Allen personally can be liable for negligence.

The majority is correct in noting that, in a contract for services, the defendant's failure to perform in a workmanlike manner *may* constitute a breach of contract as well as an act of negligence. *See Wilson,* 452 N.E.2d at 429. However, the majority fails to acknowledge another well-settled rule of law in Indiana: that a plaintiff who suffers a purely economic loss under a contract is restricted to contract remedies

and cannot recover for negligence. *See Choung v. Iemma,* 708 N.E.2d 7, 14 (Ind. Ct.App.1999). Indiana courts define economic loss as damage to the product itself. *See Progressive Ins. Co. v. Gen. Motors Corp.,* 749 N.E.2d 484, 488 (Ind.2001). As we explained in *Choung:*

> The theory of negligence protects interests related to safety or freedom from physical harm, including not only personal injuries, but also damage caused by defective personal property. *Jordan v. Talaga,* 532 N.E.2d 1174, 1181 (Ind.Ct.App.1989), *trans. denied.* For example, the damages to an automobile wrecked by reason of its own bad brakes, as well as damages to other property in the vicinity, are compensable through an action in negligence. *Id.*
>
> > But where there is no accident, and no physical damage, and the only loss is a pecuniary one, through loss of value, or use of the thing sold, or the cost of repairing it, the courts have adhered to the rule ... that purely *economic interests* are not entitled to protection against mere negligence, and so have denied recovery [emphasis in original].
>
> *Id.,* citing W. Prosser, *Handbook on the Law of Torts,* § 101 at 665 (4th Ed.1971). "Economic loss may be defined as 'damages for inadequate value, costs of repair and replacement of the defective product, or the consequent loss of profits ... as well as the diminution in the value of the product because it is inferior in quality ... to recover in negligence there must be a showing of harm above and beyond disappointed expectations [ellipses in original].'" *Jordan,* 532 N.E.2d at 1181, *quoting Redarowicz v. Ohlendorf,* 92 Ill.2d 171, 177, 65 Ill. Dec. 411, 413, 441 N.E.2d 324, 327 (Ill. 1982).
>
> In *Redarowicz,* a homeowner sued the builder of his home for the negligent construction of the chimney and adjoining brick wall. The court held that a complaint seeking damages for the cost of replacement and repair for qualitative defects in a product does not belong in tort. 92 Ill.2d at 177, 65 Ill.Dec. at 413, 441 N.E.2d at 327. The additional expenses for living conditions incurred by the buyer were economic losses not recoverable under a negligence theory. *Id.*
>
> In *Jordan,* a homeowner brought an action against the developers of his subdivision alleging theories of negligence and breach of the implied warranty of habitability. The homeowner sought damages for the diminution in the value of his house and personal property damage caused by severe water and drainage problems on his property. This Court held that the damage to the homeowner's property and the diminution of the house's fair market value were the result of periodic flooding. *Jordan,* 532 N.E.2d at 1182. Relying on *Redarowicz,* we concluded that the damages were economic in nature because they represented deterioration and disappointed expectations, which are not recoverable under a negligence theory. *Id.*
>
> Here, Choung complains that he suffered property damage to his house, foundation, garage, footers, and septic system because of a poorly constructed foundation, resulting in a loss of value to the house and the costs to repair and replace the damages. However, these claims are economic in nature because they did not arise from physical harm to Choung or his personal property; instead, they arise from a loss of value and cost of repair to his house. Choung's claims are not recoverable under negligence; his theory of recovery lies in contract. "A buyer's desire to enjoy the benefit of his bargain is not an interest that tort law traditionally protects."

*Jordan* [,] 532 N.E.2d at 1181, *quoting Redarowicz*, 92 Ill.2d at 177, 65 Ill.Dec. at 413, 441 N.E.2d at 327; *see also* W. Prosser, *Handbook on the Law of Torts*, § 92 at 613 (4th Ed.1971).

*Choung*, 708 N.E.2d at 13–14 (final brackets added).

I find nothing in the record to suggest that the Estelles suffered any losses beyond the cost of repairing the defects in Allen Construction's work. Even though Allen Construction's work seems to have been unworkmanlike indeed—perhaps even to the point of posing the *risk* of injury—there is no evidence that the Estelles *were* in fact injured or that the poor workmanship damaged any of their personal property. As in *Redarowicz*, "[t]his is not a case where defective construction created a hazard that resulted in a member of the plaintiff's family being struck by a falling brick .... [nor has a] wall .... collapsed on and destroyed the plaintiff's living room furniture." 65 Ill.Dec. 411, 441 N.E.2d at 327. The Estelles have suffered purely economic damages and, because their contract claim makes them whole, I would hold that their negligence claim is barred. I agree with the trial court's conclusion that Allen is not personally liable and would affirm on this issue, but I do not agree with the trial court and the majority

that his lack of personal liability has anything to do with his status as president of Allen Construction.[10] In all other respects, I concur with the majority's opinion.

---

**10.** Even though I believe that we need not even reach the issue of whether Allen could be held personally responsible for the negligence of Allen Construction, I feel compelled to express my disagreement with the majority's analysis on this point. The actual tortfeasor can *always* be held personally liable for the tort, and if the negligence claim against Allen were not barred by the economic loss doctrine, there would be no need to resort to agency or corporation law, as the majority does, to hold him personally liable for negligence. *See Tolliver*, 538 N.E.2d at 976 ("An agent who commits a tortious act is equally liable with the principal. The individual and the corporation are jointly liable and may properly be joined as defendants.") (citation

omitted). Since a corporation can act *only* through its agents, *see Cincinnati Ins. Co. v. Wills*, 717 N.E.2d 151, 175 (Ind.1999), the question is not whether the agent can be held responsible for the negligence of the corporation but whether the corporation can be held responsible for the negligence of the agent. It is not that the negligence of the corporation causes the agent to be negligent; a corporation can never be negligent, only *liable* for the negligence of its agent under the doctrine of respondeat superior. *See Warner Trucking, Inc. v. Carolina Cas. Ins. Co.*, 686 N.E.2d 102, 105 (Ind.1997) ("An employer is vicariously liable for the wrongful acts of employees committed within the scope of employment.").